429 Mich. 81 (1987)
413 N.W.2d 392
In re CONTEMPT OF DOUGHERTY
WILLIAMS INTERNATIONAL CORPORATION
v.
SMITH
WILLIAMS INTERNATIONAL CORPORATION
v.
SCHOONOVER-HIGGINS
Docket Nos. 77337, 77338, (Calendar No. 13).
Supreme Court of Michigan.
Argued January 14, 1987.
Decided October 6, 1987.
Keywell & Rosenfeld (by Dawn L. Phillips and Jeffrey C. Kauffman) for the plaintiff.
Kelman, Loria, Downing, Schneider & Simpson (by Michael L. Pitt), Goodman, Eden, Millender & Bedrosian (by William H. Goodman and Ernest Goodman), Mogill, Posner, Cohen & Weiss (by Kenneth M. Mogill and F. Randall Karfonta), *86 Sommers, Schwartz, Silver & Schwartz (by Barbara A. Patek), and Deborah A. Choly for the defendants.
Amici Curiae:
Plunkett, Cooney, Rutt, Watters, Stanczyk & Pedersen, P.C. (by John P. Jacobs), for the Peace and Justice Commission of the Diocese of Lansing and the Peace and Justice Committee of St. Joan of Arc Parish.
Stark & Gordon (by Clark D. Cunningham) and Bell & Associates, P.C. (by Glen R. Warn), for Bishops Judith Craig, H. Coleman McGehee, and Thomas J. Gumbleton.
Sommers, Schwartz, Silver & Schwartz, P.C. (by Justin C. Ravitz), for the Detroit Chapter of the National Lawyers Guild, the National Conference of Black Lawyers, and the Michigan Trial Lawyers Association.
CAVANAGH, J.
INTRODUCTION
Appellants in these consolidated cases challenge the validity of two civil contempt orders. The circuit judge found appellants in civil contempt of court for violating a June 29, 1983, permanent injunction enjoining them from trespassing on, and obstructing ingress or egress to, Williams International Corporation's plant at Walled Lake, Michigan.[1] The appellants were ordered incarcerated *87 until they purged their contempt by promising to obey the injunction in the future.
Appellants argue before this Court that their contempt was criminal and that the trial court's sentencing discretion was therefore limited under MCL 600.1715(1); MSA 27A.1715(1) to imprisonment for a definite period, not in excess of thirty days, a $250 fine, or both. Alternately, they contend that if their contempt was civil in nature the trial court exceeded its authority by requiring a promise of future obedience to the court's injunction as a means of purging their contempt. The requirement of this promise was further challenged as unauthorized by existing statutory law, contrary to the free speech and expression guarantees of the Michigan and federal constitutions, and as not being the least-restrictive alternative available to the trial court to protect Williams International's legitimate property interests.
We hold that the trial court erred in imposing a coercive sanction upon appellants for their trespass upon Williams' land, a past violation of the trial court's injunction. Since appellants were, at the time of the contempt hearing, in compliance with the injunction, it was beyond the power of the trial court to impose an indefinite, coercive sentence upon them. The trial court was limited to imposing a criminal sanction, after a properly conducted criminal contempt proceeding, or to issuing a civil contempt order compensating plaintiff for its actual losses.
FACTS
The Court of Appeals set forth the facts leading *88 to the issuance of the June 29, 1983, injunction as follows:
Williams operates a manufacturing complex in Walled Lake, Michigan, with a physical plant consisting of 63 acres surrounded by an 8-foot-high fence. Part of the Walled Lake operations involves the manufacture of a gas turbine engine which the United States government uses in the cruise missile. The Walled Lake plant has been the object of demonstrations by appellants and others who protest Williams' participation in the production of nuclear weapons. In May, 1983, certain individuals entered the premises by cutting the perimeter fence and spread ashes on the grounds and defaced the walls of buildings. Williams filed a complaint in the circuit court which resulted in a default judgment and a permanent injunction enjoining several individuals, including defendants-appellants Margaret Dewey and Peter Dougherty, and all persons acting in concert with them, from trespassing on and obstructing ingress and egress to Williams' premises at Walled Lake.[2]
These two cases concern violations of the permanent injunction which occurred on April 20, 1984,[3] and June 11, 1984.[4] Hearings were held before the trial court on the dates of the incidents, and appellants admitted that they did, with knowledge of the injunction, violate its provisions.[5] The trial *89 court found all appellants in civil contempt of court and committed them to the Oakland County jail[6] until they purged themselves of the contempt by promising to obey the court's June 29, 1983, injunction in the future. The orders provided that upon purging their contempt they would be released from jail.[7]
The trial court additionally found the April 20 appellants in contempt of court for their conduct in court for "refusing to agree to refrain from violating" the injunctive order.
The April 20, 1984, contemnors filed a claim of appeal with the Court of Appeals on April 30, 1984. On May 10, 1984, the Court of Appeals stayed the April contempt order and appellants were released from jail. Three of the four June contemnors executed stay bonds and were freed. The fourth, Margaret Dewey, was released from jail after conducting a fast and after the trial court determined that she was no longer capable *90 of violating the injunction. The June contemnors filed a claim of appeal with the Court of Appeals, which the Court consolidated with the April contemnors' appeal.
The Court of Appeals affirmed the contempt orders, finding that the proceedings were civil in nature because of the trial court's expressed purpose to secure the contemnors' future compliance with the injunction.[8] Additionally, the Court of Appeals upheld the propriety of conditioning the release of the appellants upon their willingness to promise to abide by the injunction in the future.[9]
We granted appellants' applications for leave to appeal.
DISCUSSION
I
A
The sui generis nature of contempt proceedings has often obfuscated the distinction between criminal and civil contempt.[10] The confusion between criminal and civil contempt has resulted partly from the fact that all contempts may be said to be criminal in nature because they permit imprisoning a contemnor for wilfully failing to comply with an order of the court. Hence, legal authors and courts have stated that all contempts are "quasi-criminal" or "criminal in nature."[11] As one court aptly stated, "[a] contempt proceeding occupies *91 what may be termed the twilight zone between civil and criminal cases...."[12]
The United States Supreme Court has recognized that contempts are "neither wholly civil nor altogether criminal," Gompers v Bucks Stove & Range Co, 221 US 418, 441; 31 S Ct 492; 55 L Ed 797 (1911), and has stated that "`it may not always be easy to classify a particular act as belonging to either one of these two classes.'" Id., quoting Bessette v WB Conkey Co, 194 US 324, 329; 24 S Ct 665; 48 L Ed 997 (1904).
Although it may be difficult to distinguish between criminal and civil contempts, this distinction is often critical since a criminal contempt proceeding requires some, but not all, of the due process safeguards of an ordinary criminal trial[13] and because the purpose sought to be achieved by imprisoning a civil contemnor (coercion) varies significantly from the purpose of imprisoning a criminal contemnor (punishment). Furthermore, Michigan statutory law limits a court's sentencing discretion in all contempts, "except in those cases where the commitment is for the omission to perform an act or duty which is still within the power of the person to perform," to thirty days imprisonment, or a fine of $250, or both. MCL 600.1715(1); MSA 27A.1715(1).[14] As will be shown below, a commitment for the omission to perform *92 an act or duty that is within the power of the party to perform is the classical case of civil contempt that permits the use of a coercive sanction.
The oft-cited case of Gompers, supra, is the leading case distinguishing between criminal and civil contempts. In Gompers, Samuel Gompers and several other labor union leaders were enjoined from boycotting Bucks Stove and Range Company and from publishing that Bucks Stove was on any "unfair" or "we don't patronize" list. Gompers and two others engaged in acts that violated this injunction and Bucks Stove petitioned the trial court to hold them in contempt. After a hearing on the petition, the court found all three individuals in contempt of court and sentenced them to definite jail terms of six, nine, and twelve months.
The United States Supreme Court reversed defendants' contempt adjudications on the ground that the contempt proceeding was conducted as if it were civil, but the sentence meted out was fixed and wholly punitive and, therefore, criminal. Gompers, supra, 444. Bucks Stove's petition for contempt was ordered dismissed without prejudice to the lower court's entertaining proceedings for any criminal contempt committed against it. Id., 452.
In distinguishing between criminal and civil contempts, the Gompers Court focused on the character and purpose of the punishment imposed upon the contemnors:
It is not the fact of punishment but rather its character and purpose that often serve to distinguish *93 between the two classes of cases. If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court. [Id., 441.]
Although the Court recognized that a civil contempt proceeding may have a punitive, as well as remedial effect,[15] the Court stated that imprisonment for civil contempt is properly ordered "where the defendant has refused to do an affirmative act required by the provisions of an order which, either in form or substance, was mandatory in its character." Id., 442. Examples given by the Supreme Court included the failure to pay alimony or surrender property as ordered and the failure to make a conveyance required by a decree for specific performance. Id.
The Gompers Court stated that imprisonment for criminal contempt is different in character and purpose from civil contempt because it seeks to vindicate the authority of the court. Id. The Supreme Court determined that imprisonment for criminal contempt is appropriate where "the defendant does that which he has been commanded not to do...." Id., 442. In such a case, "the disobedience is a thing accomplished." Id. Expounding upon the purpose and character of imprisonment for criminal contempt, the Court stated:
Imprisonment cannot undo or remedy what has been done nor afford any compensation for the pecuniary injury caused by the disobedience. If the sentence is limited to imprisonment for a definite period, the defendant is furnished no key, and he cannot shorten the term by promising not to repeat the offense. Such imprisonment operates, not *94 as a remedy coercive in its nature, but solely as punishment for the completed act of disobedience. [Id., 442-443.]
After engaging in this analysis, the Supreme Court advanced the following test as determinative of the character of punishment:
The distinction between refusing to do an act commanded,  remedied by imprisonment until the party performs the required act; and doing an act forbidden,  punished by imprisonment for a definite term; is sound in principle, and generally, if not universally, affords a test by which to determine the character of the punishment. [Id., 443.]
The United States Supreme Court has consistently observed this distinction in subsequent cases. See Shillitani v United States, 384 US 364, 368; 86 S Ct 1531; 16 L Ed 2d 622 (1966) (conditional imprisonment for purpose of compelling witnesses to obey orders to testify is civil contempt); Cheff v Schnackenberg, 384 US 373, 377; 86 S Ct 1523; 16 L Ed 2d 629 (1966) (former corporate president and chairman of the board could be found in criminal contempt only for violating a court order to obey a Federal Trade Commission cease and desist order because no remedial purpose could be served where the contemnor has severed relations with the corporation prior to the contempt proceeding); Yates v United States, 355 US 66, 72; 78 S Ct 128; 2 L Ed 2d 95 (1957) (imprisonment of witnesses who refuse to answer questions was criminal contempt where the sentences were not imposed for purposes of coercing answers but rather to punish witnesses for refusal); United States v United Mine Workers, 330 US 258, 302-303; 67 S Ct 677; 91 L Ed 884 (1947) (contemnors properly found in criminal contempt *95 for violating the order of the court prohibiting miners from interfering with the operation of the mines by striking or ceasing work); Penfield Co v Securities & Exchange Comm, 330 US 585, 590; 67 S Ct 918; 91 L Ed 1117 (1947), reh den Penfield Co v SEC, 331 US 865 (1947) (civil contempt proceeding proper where SEC sought enforcement of subpoena compelling production of documents).[16]
This Court has, in the past, distinguished criminal from civil contempt as follows:
"If the contempt consists in the refusal of a party to do something which he is ordered to do for the benefit or advantage of the opposite party, the process is civil, and he stands committed till he complies with the order. The order in such a case is not in the nature of a punishment, but is coercive, to compel him to act in accordance with the order of the court. If, on the other hand, the contempt consists in the doing of a forbidden act, injurious to the opposite party, the process is criminal, and conviction is followed by fine or imprisonment, or both; and this is by way of punishment. In one case the private party is interested in the enforcement of the order, and, the moment he is satisfied, the imprisonment ceases. On the other hand, the State alone is interested, in the enforcement of the penalty, it being a *96 punishment which operates in terrorem, and by that means has a tendency to prevent a repetition of the offense in other similar cases." [People ex rel Attorney General v Yarowsky, 236 Mich 169, 171-172; 210 NW 246 (1926), quoting State v Knight, 3 SD 509; 54 NW 412 (1893).]
Although not citing Gompers, supra, the distinction set forth in Yarowsky is essentially that advanced in Gompers. See, also, Cross Co v UAW Local 155, 377 Mich 202, 210; 139 NW2d 694 (1966). (A contempt proceeding for violation of a temporary injunction enjoining the defendants from interfering with the ingress or egress to a plant was criminal in nature because the sentences imposed "were in the nature of punishment for offenses committed, not to enforce the performance of an act.")
The Legislature has codified the common-law power of courts to punish for contempt. See MCL 600.1701 et seq.; MSA 27A.1701 et seq.[17] This statute provides as follows:
(1) ... punishment for contempt may be a fine of not more than $250.00, or imprisonment which, except in those cases where the commitment is for the omission to perform an act or duty which is still within the power of the person to perform shall not exceed 30 days, or both, in the discretion of the court.
(2) If the contempt consists of the omission to perform some act or duty which is still within the power of the person to perform, the imprisonment shall be terminated when the person performs the act or duty or no longer has the power to perform the act or duty which shall be specified in the order of commitment and pays the fine, costs, and expenses of the proceedings which shall be specified in the order of commitment. [MCL 600.1715; MSA 27A.1715.]
*97 This codification of the common-law power to punish contempts implicitly recognizes the distinction between doing an act forbidden by court order and refusing or omitting to perform an act commanded by court order. Only where the "contempt consists of the omission to perform some act or duty which is still within the power of the person to perform," does the Legislature authorize an indefinite, coercive sentence. Where the contempt involves committing an act forbidden by the court, this statute limits the possible sanction to thirty days imprisonment, a $250 fine, or both. This sanction is not coercive, but rather is permitted as punishment for violating a court order.
B
However, the test for distinguishing between refusing to do an act commanded, which would permit a coercive remedy, and doing an act forbidden, allowing only punishment for the completed act of disobedience, affords only a general test to determine the character of the punishment. The Supreme Court itself recognized that this test was not "universal[]." See Gompers, supra, 443.
What this test fails to recognize is that there are two types of civil contempt sanctions, coercive and compensatory. MCL 600.1721; MSA 27A.1721 codifies the compensatory sanction:
If the alleged misconduct has caused an actual loss or injury to any person the court shall order the defendant to pay such person a sufficient sum to indemnify him, in addition to the other penalties which are imposed upon the defendant. The payment and acceptance of this sum is an absolute bar to any action by the aggrieved party to recover damages for the loss or injury.
*98 The distinction between these two civil contempt sanctions was discussed in United Mine Workers, supra, 303-304, where the United States Supreme Court stated:
Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained. Where compensation is intended, a fine is imposed, payable to the complainant. Such fine must of course be based upon evidence of complainant's actual loss, and his right, as a civil litigant, to the compensatory fine is dependent upon the outcome of the basic controversy.
But where the purpose is to make the defendant comply, the court's discretion is otherwise exercised. It must then consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired. [Citations omitted.]
See, also, Fink, Basic issues in civil contempt, 8 NM L R 55, 70-77 (1977-78).
Thus, there are three sanctions which may be available to a court to remedy or redress contemptuous behavior: (1) criminal punishment to vindicate the court's authority; (2) coercion, to force compliance with the order; and (3) compensatory relief to the complainant.
In order to determine whether a coercive sanction is available to remedy contemptuous behavior, it may be necessary to look beyond whether the contemnor refused to do an act commanded, or has done an act forbidden. Certainly, when the contemnor is ordered to engage in a certain act, and fails to do so, under Gompers, and pursuant to *99 MCL 600.1715; MSA 27A.1715, the court may use a coercive sanction.
However, the converse, that the doing of an act forbidden does not permit a coercive sanction, is not always true. It may be that a contemnor, who has done that which is prohibited by court order, may be properly subjected to a coercive sanction. In such a case, as in all cases where a coercive sanction is appropriate, the proper focus is whether there is some act that can be coerced by the sanction so that the contemnor's performance of the act will put him into compliance with the underlying order. See Dobbs, Contempt of court: A survey, 56 Cornell L R 183, 235-236, 240 (1971); Fink, supra, 58, 60-61, 70-77. This focus was recognized by the Supreme Court when it stated that "[j]udicial sanctions in civil contempt proceedings may, in a proper case, be employed ... to coerce the defendant into compliance with the court's order...." United Mine Workers, supra, 303. See, also, Gompers, supra, 442, where it was said that a coercive sanction "is intended to coerce the defendant to do the thing referred by the order for the benefit of the complainant."
What is apparent from cases such as Gompers and United Mine Workers is that a coercive sanction is proper where the contemnor, at the time of the contempt hearing, is under a present duty to comply with the order and is in present violation of the order. Where the contemnor is not in present violation of the order, there is no need to coerce compliance, since, of course, there is already compliance. An example may be helpful. A court enjoins a defendant from striking. The defendant strikes and a contempt hearing is held. At the hearing defendant is under duty to obey the order and, if he is still on strike, is presently violating the order. Therefore, a coercive sanction, *100 such as a $100 fine for each day he remains on strike, is entirely proper.
However, where there is only a past duty to obey the court order, or a present duty, but only a past violation of the order, a coercive sanction is not permissible. It is not a proper sanction because there is nothing to coerce. In fact, defendant is, at the time of the hearing, either in actual compliance with the order, or under no present duty to comply. In such a case the court is limited to imposing a criminal sanction, after a properly conducted criminal contempt proceeding, or issuing a civil contempt order compensating the complainant for actual losses.
Similarly, where there is a present and future duty, or only a future duty, and no present violation of the order, a coercive sanction is not permissible.
This analysis explains the result reached in United Mine Workers. In that case, the Supreme Court upheld the trial court's finding that the contemnors, the union, and its president were in civil as well as criminal contempt of court for violating a temporary order enjoining them from encouraging the mine workers to interfere with the operation of the mines by striking or ceasing work.[18]
*101 A close reading of United Mine Workers reveals that the union and its president were in present violation of the injunction at the time of the contempt hearing. The union and its president were in present violation because they had notified the Secretary of the Interior that an agreement reached between the secretary and the union president, known as the Krug-Lewis Agreement, was being terminated by the union. Furthermore, Lewis, as the union president, mailed a letter to union members informing them that the union had terminated the agreement. The effect of this was to encourage miners to interfere with the operation of the mines by work stoppage or strike. *102 In fact, within days of the mailing of the letter to the union members, a general walkout occurred, turning into a full-blown strike. Since the defendants maintained their position that they had authority to terminate the Krug-Lewis Agreement and had not rescinded the notice to the miners that the agreement was terminated, they were in present violation of the injunction because they were encouraging the miners to interfere with the operation of the mines. Thus, their contemptuous behavior could be remedied by a coercive remedy.
Moreover, there were acts that could be coerced by the conditional fine imposed upon the defendants. The Supreme Court stated that the defendants could comply with the injunction, and purge their contempt, by
withdrawing unconditionally the notice given by it, .. . terminating the Krug-Lewis agreement ... and by notifying, at the same time, its members of such withdrawal ... and similarly instructing the members of the defendant union of the withdrawal of any other notice to the effect that the Krug-Lewis agreement is not in full force and effect until the final determination of the basic issues arising under the said agreement. [Id., 305.]
Unlike the defendants in United Mine Workers, the Williams International protesters were not in present violation of the injunction at the time of the contempt hearing. They were only in past violation of the injunction. Furthermore, there was no act that could be coerced that would put defendants into compliance with the injunction. The injunction prohibited trespassing and defendants were not trespassing at the time of the contempt hearing. Therefore, any coercive sanction would accomplish nothing, and the only appropriate *103 sanction for their contemptuous behavior is criminal, after an appropriate criminal proceeding, or a civil order of compensation indemnifying plaintiff for any actual damage or loss it sustained.[19]
*104 Our holding that a coercive sanction is proper only when the contemnor, at the time of the contempt proceeding, is in present violation of the court's order, has support in cases which have addressed the issue of anticipatory contempt. In United States v Johnson, 736 F2d 358 (CA 6, 1984), Timothy Neal was arrested and indicted by a grand jury for bank robbery. Neal entered into a plea bargaining agreement with the federal government wherein he would receive no more than seven years imprisonment if he testified against his partners in the robbery. Neal testified before the grand jury, and his partners, including Johnson, were indicted. On the date Neal was to plead guilty, he indicated that he had changed his mind and would not plead guilty. The government adjourned his partners' trial, and, after Neal was found guilty of bank robbery in a jury trial, the government filed a motion to compel his testimony and to hold him in civil contempt for refusing to testify. At this hearing, Neal indicated that he would not testify because of threats against his family and himself. After he refused to testify, the district court found him in civil contempt and incarcerated him for an indefinite time. Johnson, supra, 359-360.
On appeal, the Sixth Circuit reversed, determining *105 that Neal was incarcerated on the basis of "his statement that he will in the future refuse to testify at a trial that has not yet begun." Id., 360. The Sixth Circuit found that this "anticipatory contempt" was an improper use of the court's contempt power. Johnson further noted:
Imposing coercive imprisonment upon the statement that testimony will not be given in the future is certainly a greater exercise of power than imposing a similar sanction upon an actual demand for, and refusal of, testimony.... The inquiry by the court as to whether the witness will testify at a future date is itself an exercise of power not normally used in contempt proceedings. [Id., 363.]
Furthermore, the Johnson court pointed out that had Neal agreed to testify upon the threat of anticipatory contempt, there would be no guarantee that he would testify and, therefore, no benefit to the prosecutor from the promise. Id., 363.
Johnson relied upon United States v Bryan, 339 US 323; 70 S Ct 724; 94 L Ed 884 (1950), reh den 339 US 991 (1950), in repudiating the concept of anticipatory contempt. In Bryan, the Supreme Court reviewed a conviction of criminal contempt of Congress based upon a refusal to produce documents requested by a subpoena duces tecum. The Bryan Court, 341, stated:
The offense of contempt of Congress, with which we are presently concerned, on the other hand, matures only when the witness is called to appear before the committee to answer questions or produce documents and wilfully fails to do so. Until that moment he has committed no crime. There is, in our jurisprudence, no doctrine of "anticipatory contempt."
*106 The Johnson court read Bryan as indicating that the Supreme Court would not have affirmed the contempt of Congress conviction "had the defendant merely stated an intention not to comply before the subpoena required her presence: "`Of course a witness may always change his mind. A default does not mature until the return date of the subpoena, whatever the previous manifestations of intent to default.'" Johnson, supra, 364, quoting Bryan, supra, 330. (Emphasis added by the Johnson court.)
That the mere intent to act in violation of a court's order cannot be punished as a contempt is clear from the Supreme Court's opinion in In re McConnell, 370 US 230; 82 S Ct 1288; 8 L Ed 2d 434 (1962). In that case an attorney demanded to make an offer of proof pursuant to the Federal Rules of Civil Procedure. The trial judge denied the attorney the opportunity. The attorney stated that he would do so unless stopped by the bailiff. After a brief recess, the attorney did not attempt to make his offer of proof. Nevertheless, the trial court held him in contempt of court for obstruction of justice. The Supreme Court reversed the contempt finding, stating:
[T]he bailiff never had to interrupt the trial by arresting petitioner, for the simple reason that after [his initial] statement petitioner never did ask any more questions along the line which the judge had forbidden. And we cannot agree that a mere statement by a lawyer of his intention ... can be punished under the limited powers of summary contempt.... [Id., 236.]
What the anticipatory contempt cases of Johnson and Bryan and the Supreme Court opinion in McConnell teach is that it is beyond the power of a court to exercise its contempt power where a party *107 has indicated only that it intends not to comply with the court's order in the future.
In the present case the trial court imposed a coercive sanction upon the appellants for not promising to obey the court's injunction in the future. However, the mere intention to disobey the order in the future does not mean that the appellants will, in fact, violate the order. Although the past violation may be sanctioned by punishment or a compensatory fine, the use of a coercive sanction to compel future compliance, when the contemnor is presently in compliance, suffers from the same flaws as using the contempt power to punish a future intent to violate an order. Like the Supreme Court, we cannot agree that a mere statement of intent to violate an order in the future is subject to a court's contempt powers, including the power of a coercive sanction where the contemnor is in compliance with the order, but does not agree to comply with the order in the future.
C
The analysis that we advance, looking to whether the contemnor, at the time of the contempt hearing, is presently in violation of the order, explains the results reached in our own cases. In Yarowsky, supra, a chancery proceeding was brought by the Attorney General to abate a public nuisance, a house of prostitution. The circuit court declared the house a nuisance and, amongst other relief awarded the Attorney General, enjoined the homeowners and Grace Smith, operator of the premises, from conducting, maintaining, or operating those or other premises for purposes of prostitution. Id., 170. Smith was later adjudged guilty of contempt for violating the injunction by operating a house of prostitution at *108 another location and sentenced to a determinate sentence of three months in the county jail.
Although it is not entirely clear from the facts in the case, it is likely that the police closed down Smith's operation of the second house of prostitution. Thus, at the time of the contempt hearing, Smith was not in present violation of the injunction, having violated the injunction only in the past. Hence, it was appropriate for the Court to impose a determinate, criminal sanction upon Smith. It would have been improper to impose a coercive sanction.
In Great Lakes Greyhound Lines v Int'l Union, UAW-CIO, 341 Mich 290; 67 NW2d 105 (1954), app dis 350 US 804 (1955), the defendants, including several individual officers of the union, were temporarily enjoined from establishing or maintaining a picket line at the plaintiff's garages. The plaintiff petitioned for an order to show cause to hold the defendants in contempt of court when they violated the temporary injunction. At a hearing on the petition, the trial court suggested that the pickets be withdrawn and the parties enter into negotiations. At this point, it would have been proper for the court to impose a coercive sanction; the defendants were maintaining a picket line at the time of the contempt hearing and were therefore presently violating the injunction. However, the court sought to encourage the parties to settle the strike.
Upon reconvening the contempt hearing, counsel for both the plaintiff and the defendants indicated that they had negotiated a settlement to the strike. However, the trial court denied a request that the court dismiss the contempt proceedings, stating that it would punish the defendants for violating the court's injunction. Id., 301.
This Court upheld the findings of contempt except *109 for that of one defendant who did not have knowledge of the injunction. Since the defendants had violated the court's order, it was permissible for the court to impose a criminal sanction in order to vindicate its authority. However, it would have been improper to impose a coercive remedy since the strike was settled and the defendants were in present compliance with the injunction.
Williams International cites State Bar of Michigan v Cramer, 399 Mich 116; 249 NW2d 1 (1976), and In re Huff, 352 Mich 402; 91 NW2d 613 (1958), in support of its argument that a promise of future compliance with a prior court order is a common and appropriate method of purging contempt. We do not read these cases as supporting such an argument.
In neither Huff, nor Cramer did defendants challenge the court's authority to compel a promise to abide by the injunction in the future. Hence, the issue of the propriety of such a promise was not before the court.
Additionally, in Cramer the defendant was in present violation of the court's order enjoining her from engaging in the unauthorized practice of law. "There is no doubt that defendant continued to violate the January 5 order, and, indeed is still doing so." Cramer, supra, 126. Thus, even at the time this Court reviewed defendant's contempt findings, she was presently violating the order. Therefore, it was entirely proper, as this Court recognized, for the trial judge to find her in civil contempt and impose a coercive remedy.
Likewise, in Huff, the defendant was in violation of this Court's order at the time of the contempt hearing. Pursuant to an order of this Court, the court administrator assigned Judge Eugene Snow Huff to the Third District (he was elected as Judge of the Tenth District) from May 12 through June *110 12, 1958, and assigned Circuit Judge Timothy C. Quinn as presiding judge in the Tenth Circuit. Judge Huff wrote the court administrator, stating that he would not accept assignment to the Third District and intended to remain as presiding judge of the Tenth Circuit. At the opening of court on May 12, 1958, Judge Huff stated in open court that he was continuing as presiding judge of the Tenth Circuit. This Court held a show cause hearing on May 16, 1958, wherein it was established that Judge Huff failed to comply with this Court's order on May 12, 1958, and that he had not reported to the Third District for assignment. Hence, on May 16, 1958, Judge Huff was in present violation of this Court's order because he had not accepted assignment to the Third Judicial District. Thus, it would have been proper to impose a coercive sanction.
Although a coercive sanction would have been proper, this Court fined defendant $250 payable to the clerk of the Supreme Court and ordered him to serve as judge in the Third Judicial Circuit for four weeks. The $250 fine does not appear to have been conditioned upon Judge Huff accepting his assignment in the Third Judicial District. (To the extent that the fine was not conditional, it was criminal and erroneously imposed upon Judge Huff because of the lack of a proper criminal proceeding.)
II
The circuit judge in this case found defendants in civil contempt of court for violating a permanent injunction prohibiting them from trespassing on Williams International's property and from interfering with the ingress and egress of employees. The trial court imposed a civil coercive remedy, *111 sentencing defendants to jail until they promised not to violate the injunction in the future. While it is clear the trial court was seeking a way to secure the property rights of Williams International, by imposing a coercive sanction when appellants were in compliance with the injunction, the trial court exceeded its civil contempt authority. The trial court's requirement of a promise in order to purge the defendants of their past misconduct was improper as it could not undo what had already been done.[20]
A proper civil contempt proceeding seeks to coerce compliance with an act commanded by prior court order, or to compensate the complainant for actual loss. Only where the contemnor, at the time of the contempt hearing, is in violation of an order, is a coercive sanction permissible. The Williams International protesters, however, were in actual compliance with the court's order enjoining them from trespassing on Williams' property at the time of the contempt hearing. Requiring a promise to coerce future compliance with the injunction is not only impermissible, but is also of questionable value. Unlike the present defendants who have, as a matter of conscience, refused to make the promise, many people subject to such coercion might naturally make the required promise to avoid incarceration. They then either will keep their promise or violate it. If they do not keep their promise, another contempt proceeding will have to be instituted. The trial court will face the same problem of having to secure compliance with its previous order. If the court again requires a promise of future compliance, the contemnor may again make the promise and either obey or *112 disobey it. If the order is disobeyed, the contemnor has twice violated the court's order without having suffered any sanction. Hence, the civil remedy of requiring a promise to purge the contempt is largely ineffective and may serve only to call into question a court's authority. Therefore, entirely apart from the legality of the sanction, a more effective sanction for such past misconduct is a definite sentence for criminal contempt,[21] or a civil contempt order requiring appellants to compensate Williams International for any actual loss sustained by appellants' violation of the court's injunction.
CONCLUSION
The Williams International protesters were enjoined from trespassing upon Williams' land and from interfering with the ingress and egress of persons lawfully upon the land. They admittedly violated this injunction and were therefore subject to criminal contempt of court, or a civil order requiring them to compensate Williams International. However, it was improper to proceed against appellants for civil contempt of court, then *113 to inquire whether they would obey the order in the future, and sanction them, by incarcerating them in jail indefinitely, for refusing to promise to obey the court's order. Since appellants' past misconduct was a thing accomplished, and they were no longer in violation of the injunction, there could be no coercive sanction.
The trial court's orders of April 20, 1984, and June 11, 1984, finding appellants in civil contempt of court, and imposing a coercive sanction, are ordered vacated.
LEVIN, BRICKLEY, and ARCHER, JJ., concurred with CAVANAGH, J.
RILEY, C.J. (dissenting).
Appellants argue before this Court that their contemptuous acts of violating the trial court's prohibitive permanent injunction can only be viewed as criminal contempt which necessarily precludes a finding of civil contempt and the imposition of a coercive remedial sanction. They maintain that civil contempt is only available where the underlying order imposes an affirmative obligation to act which the court is attempting to enforce when confronted with the appellants' refusal to perform. I am convinced that no historical analysis, reliance on decisional or statutory authority, nor any public policy reasons, support the limitation proposed by appellants.
Moreover, although my colleagues in the majority acknowledge the trial court's authority to find the appellants in civil contempt for their contumacious acts, they conclude that it was not within the trial court's power to impose the usual civil contempt sanction of conditional imprisonment in an effort to coerce the appellants into agreeing to abide by the terms of the permanent injunction in the future. In my view, there is no such limitation on the trial court's authority.
*114 I also disagree with the majority's assertion that the distinction between a contemnor's failure to do an act commanded and the doing of an act forbidden, provides a general test for determining whether criminal or civil contempt sanctions are appropriate. As will be shown below, the nature of the contemptuous act is not material in determining whether criminal or civil contempt sanctions are permissible. Contemptuous conduct is not properly viewed as being either civil or criminal. Instead, the distinction between civil and criminal contempt lies in the nature of the sanction imposed and the court's purpose in imposing the sanction. For these reasons, I dissent from the majority's holding in these cases.
In support of their argument that a court is without authority to maintain civil contempt proceedings except in cases in which the contemptuous conduct involved the refusal to perform an affirmative act, appellants rely on the oft-cited case of Gompers v Bucks Stove & Range Co, 221 US 418; 31 S Ct 492; 55 L Ed 797 (1911). In Gompers, Samuel Gompers, and two other labor union leaders were enjoined from boycotting Bucks Stove and Range Co., and from publishing that Bucks Stove was on an "unfair" or "we don't patronize list." The defendants subsequently violated the injunction, were held in contempt and sentenced to unconditional terms of imprisonment of six, nine, and twelve months. At issue in the defendants' appeal to the United States Supreme Court from the contempt proceeding was whether that proceeding was criminal or civil. In addressing the distinction between the two, the Court stated:
[I]mprisonment for civil contempt is ordered where the defendant has refused to do an affirmative *115 act required by the provisions of an order which, either in form or substance, was mandatory in its character.
* * *
On the other hand, if the defendant does that which he has been commanded not to do, the disobedience is a thing accomplished. Imprisonment cannot undo or remedy what has been done nor afford any compensation for the pecuniary injury caused by the disobedience.... Such imprisonment operates, not as a remedy coercive in its nature, but solely as punishment for the completed act of disobedience. [Gompers, supra, 442-443.]
This language, selectively relied upon by the appellants, does not compel me to the conclusion they urge upon us. That conclusion, as aptly noted by one contempt scholar, represents a "deviant test for distinguishing civil and criminal contempt," and may not properly be induced from the decision of the United States Supreme Court in Gompers. Dobbs, Contempt of court: A survey, 56 Cornell L R 183, 240 (1971). As explained by Professor Dobbs:
This language [from Gompers] merely means that the sanction is necessarily a criminal one if nothing is left to coerce. Where the defendant has violated a single order and is under no continuing obligation, it is clear enough that only a punitive sanction is possible since no imprisonment can "undo or remedy what has been done." An illustration used earlier makes this point: if the defendant is ordered not to engage in a May Day sit-in, but does so anyway, his conduct is complete and the order is irremediably broken. Any sanction can only be punitive and hence "criminal." The distinction between mandatory orders and prohibitory ones is only illustrative of this point. For instance, a prohibitory order might enjoin trespasses *116 for all future times. If a defendant so enjoined violates the order once, there is still something left to coerce; a civil contempt would therefore be appropriate since it could be used to compel compliance for the future, even though the past trespass cannot be remedied specifically. Furthermore, to the extent that compensatory fines are used in contempt proceedings, even a past act can, in some sense, be remedied. The distinction between mandatory and prohibitory orders in Gompers, then, was not intended to be a major test; rather, it was merely indicative of cases in which contempt sanctions could be coercive and hence civil. [Emphasis added.]
While the distinction between contemptuous conduct involving violations of mandatory versus prohibitory orders may be indicative of the generality of cases in which contempt sanctions could be coercive as opposed to purely punitive, the majority's assertion that this distinction acts as a general limitation on the inherent judicial contempt power is without authoritative support, and, indeed, is inconsistent with judicial precedent. The landmark Gompers case does not support this proposition. As noted in the opinion of the Court, the sentences imposed in Gompers were unconditional definite jail terms. The Supreme Court reversed the convictions in Gompers because, among other things, the trial court had held a civil contempt hearing and then imposed a determinate criminal sentence. The contempt proceeding in that case, therefore, had been improperly treated as one for criminal contempt. As later explained in Leman v Krentler-Arnold Hinge Last Co, 284 US 448, 453; 52 S Ct 238; 76 L Ed 389 (1932):
In the Gompers case, the contempt proceeding had been instituted after the entry of the final decree awarding the permanent injunction and *117 pending an appeal from that decree. Id., pp 421, 422. This Court held that the proceeding had been improperly treated as one for criminal contempt, and, as there had been a complete settlement of all matters involved in the equity suit, the contempt proceeding was necessarily ended. The conclusion of the Court was thus stated (id., pp 451, 452): "When the main case was settled, every proceeding which was dependent on it, or a part of it, was also necessarily settled  of course without prejudice to the power and right of the court to punish for contempt by proper proceedings. Worden v Searls, 121 US [14] 27 [7 S Ct 814; 30 L Ed 853 (1887)]. If this had been a separate and independent proceeding at law for criminal contempt, to vindicate the authority of the court, with the public on one side and the defendants on the other, it could not, in any way, have been affected by any settlement which the parties to the equity cause made in their private litigation. But, as we have shown, this was a proceeding in equity for civil contempt.... The company prayed `for such relief as the nature of its case may require,' and when the main cause was terminated by a termination of all differences between the parties, the complainant did not require and was not entitled to any compensation or relief of any other character. The present proceeding necessarily ended with the settlement of the main cause of which it is a part." See Michaelson v United States, 266 US 42, 64, 65 [45 S Ct 18; 69 L Ed 162 (1924)]; Oriel v Russell, 278 US 358, 363 [49 S Ct 173; 73 L Ed 419 (1929)].
In Gompers, 444-445, the Court also said: "Proceedings for civil contempt are between the original parties and are instituted and tried as a part of the main cause." The distinction was made in that case between civil contempt proceedings and those for criminal contempt which "are between the public and the defendant, and are not a part of the original cause." Id., 445. In Gompers, the trial *118 court maintained civil contempt proceedings as part of the original civil action between the parties and imposed unconditional jail sentences, purely punitive in nature, as opposed to coercive or remedial relief on behalf of the plaintiff. In agreement with Professor Dobbs, I am convinced that the language relied upon by the appellants from the opinion of the Court in Gompers was not intended to delimit judicial authority to maintaining civil contempt proceedings only in cases in which a mandatory court order has been violated. That language, rather, was merely intended to be indicative of the distinct purposes of primarily coercive or remedial punishment, permissible civil contempt sanctions and purely punitive punishment, criminal contempt sentences, and the distinct nature of the proper proceedings for each.
The appellants' argument confuses the distinction between civil and criminal contempt and the scope of judicial discretion in exercising its inherent contempt authority. Appellants and the majority have incorrectly focused upon the nature of the contemptuous conduct giving rise to the proceedings, rather than the court's purpose in responding to that conduct. The distinction between civil and criminal contempt, however, requires focusing upon the latter and is not susceptible to such a simplistic distinction between the refusal to do an act commanded and the doing of an act forbidden. As stated by the Court of Appeals:
The distinction between civil and criminal contempt relates not to the nature of the misconduct giving rise to the proceedings, but rather to the court's purpose in responding to that misconduct. If the court's purpose is to preserve its authority by punishing past misconduct through the imposition of an unconditional and fixed sentence, the proceedings are criminal. If, instead of punishing *119 past misconduct, the court seeks to compel future compliance through the imposition of a sanction of indefinite duration terminable upon compliance or inability to comply, the proceedings are civil. [144 Mich App 257, 262-263; 375 NW2d 408 (1985).]
In the words of the United States Supreme Court in Shillitani v United States, 384 US 364, 370; 86 S Ct 1531; 16 L Ed 2d 622 (1966), "[t]he test may be stated as: what does the court primarily seek to accomplish by imposing sentence?"
Judicial authority to entertain civil contempt proceedings as part of a civil action and the authority to institute separate criminal contempt proceedings are not mutually exclusive in all cases. Nor has judicial authority been limited in any jurisdiction to exercising in every case either civil contempt discretion or instituting separate criminal contempt proceedings. See, e.g., United States v United Mine Workers of America, 330 US 258; 67 S Ct 677; 91 L Ed 884 (1947) (violation of prohibitory injunction resulted in findings and sentences for both civil and criminal contempt). In Mine Workers, 298-299, the Court noted: "Common sense would recognize that conduct can amount to both civil and criminal contempt. The same acts may justify a court in resorting to coercive and to punitive measures."
That the appellants' suggested holding in these cases does not reflect the contempt authority of the federal courts may be easily demonstrated. The United States Supreme Court has specifically upheld the judicial exercise of civil contempt powers in cases in which the contemptuous conduct involved noncompliance with prohibitory injunctions. One example is Mine Workers, supra. In that case the United Mine Workers of America and its president were preliminarily enjoined from *120 encouraging mine workers to interfere with the operation of mines by strike or cessation of work. A gradual walkout by the miners commenced shortly thereafter which soon developed into a full-blown strike. Prior to the commencement of contempt proceedings, provision was made for a hearing to determine whether the alleged contempt was sufficiently purged  whether the defendants intended to comply with the injunction. The defendants stated to the court that they did not. After contempt proceedings in which the trial court found that the defendants had violated the prohibitory injunction, each defendant was found guilty of both criminal and civil contempt. The Supreme Court affirmed the trial court's decision, including the imposition of both purely punitive and primarily coercive sanctions. Id., 303-304. With regard to the latter, the Court said:
The trial court also properly found the defendants guilty of civil contempt. Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained. (Citation omitted.) Where compensation is intended, a fine is imposed, payable to the complainant....
But where the purpose is to make the defendant comply, the court's discretion is otherwise exercised. It must then consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.
It is a corollary of the above principles that a court which has returned a conviction for contempt must, in fixing the amount of a fine to be imposed as a punishment or as a means of securing future compliance, consider the amount of *121 defendant's financial resources and the consequent seriousness of the burden to that particular defendant.
The Court modified the trial court's judgment against the union in Mine Workers by reducing the unconditional fine imposed for criminal contempt, and making that reduced amount conditional on the union's failure to purge itself by taking affirmative steps to assure the court of its future compliance with the prohibitory injunction. The opinion of the Court concluded, id., 307:
[Defendants'] conduct showed a total lack of respect for the judicial process [referring to defendants' in court statements that they intended not to comply with the injunction]. Punishment in this case is for that which the defendants had done prior to imposition of the judgment in the District Court, coupled with a coercive imposition upon the defendant union to compel obedience with the court's outstanding order.
Precedential authority in this jurisdiction also supports the use of civil contempt sanctions to enforce compliance with prohibitory orders. In State Bar v Cramer, 399 Mich 116; 249 NW2d 1 (1976), for example, this Court affirmed the imposition of civil contempt sanctions under circumstances in which the contemptuous conduct concerned the violation of a prohibitory injunction. In Cramer, the respondent had been enjoined from engaging in the alleged unauthorized practice of law. Her violation of that injunction resulted in civil contempt proceedings and the imposition of both coercive sanctions to compel future compliance and, subsequently, unconditional punitive sanctions. This Court described the contempt proceedings in Cramer as follows:

*122 There is no doubt that defendant continued to violate the January 5 order, and, indeed is still doing so. Judge O'Hair adjudged defendant "guilty of civil contempt" on April 23, 1973, and ordered her jailed until she purged herself "by demonstrating that she will discharge her statutory and judicially imposed duty to cease permanently from engaging in the conduct proscribed by the court's judgment and injunctive order of January 5, 1973."
Defendant was jailed April 30, 1973, and on May 1, 1973 appeared before Judge O'Hair and made certain representations to purge herself of contempt, and was released.
On August 6, 1973, Judge O'Hair found that defendant "has violated her purgation of contempt and has broken her promise given in connection with said purgation of contempt to this Court on May 1, 1973 wherein she promised to abstain from the proscribed activities," and again adjudged her in contempt and sentenced her to five days in jail and assessed a fine and costs. [Id., 126.]
Affirming the civil contempt sanctions imposed, this Court concluded:
There is no doubt that the April 23, 1973 finding was that defendant was guilty of civil contempt. Judge O'Hair specifically told the defendant that she would be jailed until she purged herself. She therefore was able to "carry the `keys of [the] prison in [her] own pocket' [and] the action is essentially civil." People v Goodman, 17 Mich App 175, 177; 169 NW2d 120 (1969). In fact, the following day Judge O'Hair released her after she promised to obey his order. We affirm that finding. [Id., 127-128. Emphasis added.]
The Court vacated the subsequently imposed unconditional sentences, however, because those jail sentences and fines were purely punitive in nature, not remedial or coercive, and therefore *123 were improperly imposed as a result of the admittedly "civil contempt" proceedings conducted in that case. The Court correctly identified those unconditional sentences as "criminal contempt" sanctions, id., 128 (emphasis in original). Distinguishing criminal from civil contempt, the Court said:
"If [contempt citation] is to punish the offender for his disobedience or contumacious behavior, then it is criminal contempt. If, however, the purpose is to compel obedience to an order of the court, then it is civil contempt." [Citation omitted.]
Quoting People v Johns, 384 Mich 325, 333; 183 NW2d 216 (1971), the Court stated:
"When the hearing was instituted by a show cause order and placed on the civil docket, when the proceedings lacked any semblance of a criminal trial and when the sentence had elements of both civil and criminal contempt the defendant could have reasonably expected that he indeed was being held in civil contempt [not criminal].
"We therefore hold that under the procedure followed here, the defendant could not have been found guilty of criminal contempt and his sentence for such must be vacated."
The Court in Cramer concluded that the contempt proceedings in that case were "civil" and, therefore, lacked the procedural requirements to support a conviction for criminal contempt and the imposition of unconditional punitive sentences. In reaching that decision, however, the Cramer Court expressly upheld the trial court's imposition of civil contempt sanctions to coerce future compliance with the court's prohibitionary injunctive order. In Cramer, "whether defendant was found guilty of civil or criminal contempt" was at issue, *124 and indeed was central to the disposition of that appeal, id., 127. The Court affirmed the imposition of civil contempt sanctions resulting from the violation of a prohibitionary injunction, as opposed to a purely mandatory court order. See, also, In re Huff, 352 Mich 402; 91 NW2d 613 (1958).
The appellants' argument in these cases that they could only have been adjudged in criminal contempt of court because their refusal to comply with prohibitory court orders may never result in civil contempt proceedings, is based upon an erroneous interpretation of judicial precedent. Consistent with general authority, such contemptuous conduct may properly result in both criminal and civil sanctions, provided, however, that a court may not hold a civil contempt hearing and then impose a determinate criminal sentence without the required procedural safeguards.
Furthermore, the negative public policy implications that would result from appellants' suggested holding in these cases are substantial and unwarranted. The judiciary of this state would be powerless to grant remedial or coercive relief through the exercise of the inherent civil contempt power in all cases in which civil litigants refuse to comply with prohibitory injunctions. Civil litigants, adjudged to be entitled to such injunctive relief, would have to rely exclusively on the prosecution of separate criminal proceedings for the enforcement of such orders, with the necessary and possibly irreparable delay required in such matters.
In light of the foregoing, I am convinced that the trial court did not err in finding the instant appellants in civil contempt. The purpose of the sanctions imposed by the trial court clearly was to coerce the appellants' future compliance with the June 29, 1983 permanent injunction. In that the use of civil contempt proceedings to sanction violation *125 of the court's prohibitory injunction is not beyond the general inherent power of the trial court, I would affirm the finding of civil contempt.
More importantly, although my colleagues in the majority concede that civil contempt proceedings are sometimes appropriate for purposes of sanctioning the violation of a prohibitory injunction, I cannot agree with their holding that coercive sanctions may not be imposed unless the contemnor, at the time of the contempt hearing, is under a present duty to comply with the prohibitive order and is also in present violation of the order. That conclusion is predicated upon an erroneous premise, unsupported by any authority and will result in an unnecessary limitation on the court's inherent contempt authority and its ability to enforce compliance with its valid orders.
The majority's determination that a coercive sanction is not permissible in this matter is erroneously predicated upon the false premise that there is nothing left to coerce once the appellants violated the permanent injunction by trespassing onto Williams' property. The apparent flaw in the majority's reasoning, is their failure to recognize the continuing existence of the permanent injunction, and appellants continuing obligation and ability to comply with that order in the future. Under these circumstances, a coercive sanction was clearly warranted, if not in fact necessary, to coerce the appellants into future compliance with the valid permanent injunction. This is so, particularly in light of the appellants' ardent belief in the propriety and moral necessity of their contumacious acts, which in turn led to their adamant refusal to agree to be bound by the terms of the permanent injunction in the future.
The majority's holding unnecessarily deprives the trial court in this case, and all future cases in *126 a similar posture, of an effective means of enforcing its orders and providing Williams International with the assured benefit of the injunctive relief it obtained.
As the majority indicates, contempt may be punished in several ways. However, the only rule which governs the choice of sanction in any case is that if the proceeding is a criminal one, the sanction imposed must be determinate with the purpose of punishing the contemnor; if the proceeding is a civil one, the sanction must be coercive, compensatory, or both, with the purpose of either compelling the contemnor's compliance with the order or making restitution to the party suffering damages as a result of the contemptuous act. See Dobbs, supra, 267. Of course, a necessary corollary to that rule is that a coercive sanction cannot be imposed if there is nothing to coerce. However, that is not the case in the matter before us.
The only time a coercive sanction would be impermissible is when the contemptuous act is completed and incapable of repetition. Such a situation is exemplified by the hypothetical May Day sit-in set forth by Professor Dobbs. Id., 240. Once the contemnor has violated the order enjoining him from participating in the May Day sit-in, his contemptuous conduct is complete and he no longer is able to comply with or violate the order. Thus, imposition of a coercive sanction would be illogical and futile. However, that situation is readily distinguished by Professor Dobbs, from a situation involving a past violation of a prohibitory injunction which also imposes a continuing obligation to obey the order:
For instance, a prohibitory order might enjoin trespasses for all future times. If a defendant so enjoined violates the order once, there is still *127 something left to coerce; a civil contempt would therefore be appropriate since it could be used to compel compliance for the future, even though the past trespass cannot be remedied specifically. [Dobbs, supra, 240.][[1]]
That is precisely the situation presented in the cases before us, and it cogently illustrates the propriety of the trial court's coercive sanction of conditional imprisonment in the instant cases.
The cases relied on by the majority in support of their holding serve to illustrate the use of coercive sanctions where the contemnors' are in present violation of the court's order at the time of the contempt hearing, but they clearly are not authoritative for the novel rule fashioned by the majority in the cases before us. Until today, no court has ever imposed a similar artificial limitation of the use of coercive contempt sanctions.
On the other hand, at least one federal case illustrates the propriety of imposing a coercive sanction where the contemnor had violated a prohibitive injunction, was not in present violation of the order at the time of the contempt hearing, but had a present and future duty to abide by the order.
In Lance v Plummer, 353 F2d 585 (CA 5, 1965), a volunteer deputy sheriff was held in civil contempt for harassing blacks in violation of an injunction by which he was bound. As a result, the trial court ordered the deputy to turn in his badge. The Fifth Circuit approved of the sanction, but *128 noted that sanctions for civil contempt must always offer the contemnor and opportunity to purge the contempt and that the sanction imposed in that case should only last until the deputy "should satisfy the trial court that he was no longer in violation of the injunctive order and that he would in good faith thereafter comply with the terms of the order." Id., 592. Despite the court's language requiring the deputy to satisfy the trial court that he was no longer in violation of the order, it is apparent from the facts that the deputy was not violating the order at the time of the contempt hearing. It was potential future violations that the court was attempting to avert by conditionally depriving the deputy of his badge.
Furthermore, while it is clear that the majority holding is unsupported by any decisional authority, I also note that Michigan's statutory codification of the contempt power, specifically MCL 600.1715; MSA 27A.1715, does not limit a trial court's use of civil contempt sanctions. It is well established that the power to punish for contempt is inherent in the judiciary. In re Scott, 342 Mich 614, 618; 71 NW2d 71 (1955). That power is not dependent upon statutory authorization and may not be legislatively abridged. The statute is only declaratory of the common-law power of Michigan courts to punish contempt and does not restrict those powers in any manner. Cross Co v UAW Local No 155, 377 Mich 202, 210; 139 NW2d 694 (1966). Neither the courts' use of coercive sanctions in a civil contempt proceeding nor the actions a court may require of the contemnors to purge their contempt are delimited by the contempt statute.
The majority's reliance on the anticipatory contempt cases in support of its holding is similarly inappropriate. It is readily apparent that the instant *129 case is distinguishable from United States v Johnson, 736 F2d 358 (CA 6, 1984), United States v Bryan, 339 US 323; 70 S Ct 724; 94 L Ed 884 (1950), and In re McConnell, 370 US 230; 82 S Ct 1288; 8 L Ed 2d 434 (1962), in a very important respect. That is, in none of these cases had the defendants actually violated the order which the finding of contempt was predicated upon. The Court reversed the contempt findings in these cases in recognition of the general rule that a court must exercise "`the least power adequate to the end proposed.'" Johnson, supra, 362. It is certainly an unnecessary exercise of the court's power to impose contempt sanctions before any contemptuous act is committed.
The rationale underlying these anticipatory contempt cases is not applicable to the cases before us. In sharp contrast to these cases, the appellants in the instant case were bound by an existing permanent injunction and had admittedly violated the terms of that order prior to being adjudged in contempt. Their contempt was no longer anticipatory, making the situation ripe for contempt proceedings and the imposition of coercive sanctions to enforce the contemnors' future compliance with their continuing obligation under the injunction. Moreover, in my view, the court's use of conditional imprisonment was, under the circumstances, the least restrictive exercise of power necessary to achieve that end.
I am convinced that the majority's analysis and resolution of the broadest question presented, identified as the first issue, is erroneous. The appropriate disposition of these appeals, in my opinion, depends upon the resolution of the second and, if necessary, the third issues identified in the majority opinion. I would hold that the clearly coercive sanctions imposed in the instant cases were not *130 beyond the general inherent power of the trial court to entertain civil contempt proceedings. Therefore, I would address whether the purgation requirement imposed, under the particular facts of these cases, was an appropriate exercise of the trial court's discretion and, if necessary, whether that method of purgation was constitutionally impermissible as applied. Thus, I respectfully dissent.
BOYLE and GRIFFIN, JJ., concurred with RILEY, C.J.
BOYLE, J. (dissenting).
I respectfully dissent from the majority opinion in this case and would remand to the trial court for further proceedings consistent with this opinion.
The contempt statute provides for indefinite confinement when the contempt consists of the omission to perform some act or duty which is still within the power of the party to perform. It further provides that confinement shall be terminated when the party performs the act or duty or no longer has the power to perform the act or duty specified in the order of commitment and pays the requisite fines and costs and expenses. MCL 600.1715; MSA 27A.1715. The statute clearly requires, therefore, the ability to perform the requirement at the time the order of commitment is handed down, and termination of the commitment once the ability to perform no longer exists. I note that neither of these requirements was addressed by the trial court.
I agree with Chief Justice RILEY'S dissent in this case that the coercive sanctions imposed were not beyond the general inherent power of the trial court to entertain civil contempt proceedings. However, without specific findings by the trial court on the ability of the contemnors to comply *131 with the purgation requirement at the time the order of commitment was handed down, I would not review the question whether the purgation requirement was an appropriate exercise of the trial court's discretion or whether it was constitutionally permissible. Whether the ability to perform the purgation requirement currently exists remains a viable question. If there is no substantial likelihood that the promises would be forthcoming, because of ethical, religious, or moral concerns, then the civil contempt loses its remedial character and becomes punishment.
Therefore, I would remand the case to the trial court to provide the parties an opportunity to raise the question whether there is a substantial likelihood that continued commitment will accomplish the purpose of the order upon which the commitment is based. In re Farr, 36 Cal App 3d 577, 584; 111 Cal Rptr 649 (1974). See, also, Catena v Seidl, 68 NJ 224; 343 A2d 744 (1975). Given the inherent power of the trial court in contempt proceedings to modify its own orders of commitment for humane reasons, the trial court should have an opportunity to consider such factors as whether the contemnors' refusal to comply with the purgation requirement is based on an articulated moral, ethical, or religious principle, the length of time the order of commitment has been outstanding, the length of confinement, and the contemnors' age and state of health. The burden of establishing that continued confinement will not have a coercive effect should be on the contemnors.
I recognize that underlying the instant case is the seemingly unlimited power of the trial court to exercise its coercive power in contempt proceedings. Hence, it would be appropriate for the Legislature to act as it has in other areas, see, e.g., MCL 552.637; MSA 25.164(37) (time limitation for *132 confinement due to contempt for nonpayment of child support) and MCL 767.19c; MSA 28.959(3) (time limitation for confinement due to contempt for refusal or neglect to appear or testify before the grand jury), and prescribe a reasonable amount of time in which a court may properly exercise its coercive powers during civil contempt proceedings.
NOTES
[1] Appellants Peter Dougherty, James Smith, and Margaret Dewey were named defendants in the June 29, 1983, injunctive order. As is typical of such injunctive orders it provided that "all persons acting in concert with [the named defendants]" were restrained from trespassing and obstructing ingress or egress to Williams' property. The trial court determined that the remaining appellants in this case were acting in concert with the named defendants.
[2] Williams Int'l Corp v Smith, 144 Mich App 257, 259; 375 NW2d 408 (1985).
[3] Supreme Court Docket No. 77337.
[4] Supreme Court Docket No. 77338.
[5] Appellants in Docket No. 77337 admit that on Good Friday, April 20, 1984, they carried a wooden cross onto Williams International's property, stretched a chain between themselves, and poured their blood onto the driveway. Williams International asserts that the appellants further defaced its property by smearing a red substance on the fence enclosing the facility. Appellants in Supreme Court Docket No. 77338 admit that on June 11, 1984, they trespassed upon Williams International's driveway and engaged in prayer. Williams contends that the June 11, 1984, appellants attempted to lock the facility gate with an elaborate padlock, blocking the ingress and egress of its employees.
[6] All appellants except for Joel Nigg and Carfon Foltz were incarcerated from twenty-one to ninety-six days. The trial court determined that Joel Nigg purged himself by making certain statements that indicated he would abide by the injunction. Carfon Foltz was not incarcerated because of health concerns. None of the appellants are currently incarcerated.
[7] The language used by the trial court in requiring a promise to purge the contempts differed in the two contempt orders. The contempt order concerning the April 20, 1984, incident stated that appellants were to remain in jail "until they have purged themselves of contempt by agreeing to be bound by the Judgment of Permanent Injunction of this Court entered on June 29, 1983." The June 11, 1984, contempt order provided, in part, that "each Respondent shall hold the keys to his jail cell, in that he or she shall remain committed to the Oakland County Jail until he or she shall purge himself or herself of contempt by demonstrating that he or she will discharge his or her statutory and judicially imposed duty to cease permanently from engaging in the conduct proscribed by this Court's judgment entered on June 29, 1983." It is clear from the colloquy between the trial court and defendants that if defendants promised to abide by the injunction in the future their contempts would be purged.
[8] 144 Mich App 263-264.
[9] Id.
[10] See Bessette v W B Conkey Co, 194 US 324, 326; 24 S Ct 665; 48 L Ed 997 (1904); Moskovitz, Contempt of injunctions, civil and criminal, 43 Colum L R 780 (1943); Dobbs, Contempt of court: A survey, 56 Cornell L R 183, 235 (1971).
[11] Moskovitz, n 10 supra, 783-784; Bessette, n 10 supra, 326.
[12] Andreano v Utterback, 202 Iowa 570, 571; 210 NW 780 (1926).
[13] Gompers, supra, 444; Bloom v Illinois, 391 US 194; 88 S Ct 1477; 20 L Ed 2d 522 (1968); In re Scott, 342 Mich 614, 618-622; 71 NW2d 71 (1955); Cross Co v UAW Local 155, 377 Mich 202, 211-213; 139 NW2d 694 (1966); cf. Sword v Sword, 399 Mich 367, 379-388; 249 NW2d 88 (1976) (neither appointed counsel nor a jury trial is constitutionally required in civil nonsupport contempt proceedings).
[14] Michigan courts have, as an inherent power, the power at common law to punish all contempts of court. In re Scott, n 13 supra, 618. This contempt power inheres in the judicial power vested in this Court, the Court of Appeals, and the circuit and probate courts by Const 1963, art 6, § 1. See, generally, In re Scott, n 13 supra; In re Huff, 352 Mich 402; 91 NW2d 613 (1958); Cross Co v UAW, n 13 supra. Therefore, statutory provisions such as MCL 600.1715; MSA 27A.1715 are merely declaratory of the courts' contempt powers and do not restrict or abridge those powers. Langdon v Wayne Circuit Judges, 76 Mich 358, 367; 43 NW 310 (1889); Nichols v Judge of Superior Court, 130 Mich 187; 89 NW 691 (1902); Cross Co, n 13 supra, 223.
[15] Gompers, supra, 441.
[16] Other jurisdictions have observed the Gompers distinction between refusing to do an act commanded and doing an act forbidden. See, e.g., DeMartino v Monroe Little League, Inc, 192 Conn 271, 277-280; 471 A2d 638 (1984); Korman v Strick, 133 Ariz 471, 473-474; 652 P2d 544 (1982); Fields v Fields, 240 Ga 173, 175-176; 240 SE2d 58 (1977); In re Lightsey v Kensington Mortgage & Finance Corp, 294 Ala 281, 285-286; 315 So 2d 431 (1975); Johansen v Alaska, 491 P2d 759, 763-764 (Alas, 1971); People ex rel Chicago Bar Ass'n v Barasch, 21 Ill 2d 407; 173 NE2d 417 (1961); South Dade Farms v Peters, 88 So 2d 891, 898-899 (Fla, 1956); Denny v State, 203 Ind 682, 702-704; 182 NE 313 (1932); cf. Culver City v Los Angeles Co Superior Court, 38 Cal 2d 535; 241 P2d 258 (1952) (in California the distinction between civil and criminal contempt is not critical since the proceedings for criminal and civil contempt are the same with those procedural rights and safeguards appropriate for criminal contempt afforded in civil contempt proceedings).
[17] See n 14 supra.
[18] One contempt scholar has written that "the majority opinion in the United Mine Workers case must be regarded as unfortunate." Fink, supra, p 64. Professor Fink thought it was unfortunate that United Mine Workers failed to follow "[t]he rule in Gompers that not only civil and criminal penalties but also civil and criminal proceedings are altogether different and separate things, and under the Constitution must be kept so ...." Id.

Justice Rutledge dissented in United Mine Workers, finding that "the idea that a criminal prosecution and a civil suit for damages or equitable relief could be hashed together in a single criminal-civil hodgepodge would be shocking to every American lawyer and to most citizens." Id., 364.
Justice Rutledge further opined:
I do not think the Constitution contemplated that there should be in any case an admixture of civil and criminal proceedings in one. Such an idea is altogether foreign to its spirit. There can be no question that contempt power was conferred adequate to sustain the judicial function, in both civil and criminal forms. But it does not follow that the Constitution permits lumping the two together or discarding for the criminal one all of the procedural safeguards so carefully provided for every other such proceeding.
The founders did not command the impossible. They could not have conceived that procedures so irreconcilably inconsistent in many ways could be applied simultaneously. Nor was their purpose to create any part of judicial power, even in contempt, wholly at large, free from any constitutional limitation or to pick and choose between the conflicting civil and criminal procedures and remedies at will. Much less was it to allow mixing civil remedies and criminal punishments in one lumped form of relief, indistinguishably compounding them and thus putting both in unlimited judicial discretion, with no possibility of applying any standard of measurement on review. [Id., 364-365.]
One explanation for the "criminal-civil hodgepodge" that the majority opinion concocted was that the United States was both plaintiff-employer seeking remedial relief and was also acting in its sovereign capacity seeking to vindicate the court's authority. This fact does not support the wholesale nullification of constitutional limitations upon a court's contempt power. See United Mine Workers, supra, 364-385 (Rutledge, J., dissenting).
We caution trial courts from combining criminal and civil contempt proceedings as it may cause undue confusion and complications. See Dobbs, Remedies, p 98.
[19] The dissent and plaintiff have failed, with one possible exception, to cite a single case in which a coercive remedy was used absent a present violation of the court's order. The only case cited that arguably supports their positions is Lance v Plummer, 353 F2d 585 (CA 5, 1965).

Lance may be read as permitting a court to coerce promises of future compliance where there is not a present violation of the court's order. However, the special interest of the state in protecting the integrity of the state's authority may also explain the rationale behind permitting the state to terminate plaintiff's appointment as a voluntary deputy sheriff. We reject the holding of Lance to the extent that it may be read as permitting a coercive sanction absent a present violation of the court's order.
Our research has also disclosed the case of Neshaminy Water Resources v Del-Aware Unlimited, 332 Pa Super 461; 481 A2d 879 (1984), where, on similar facts, the Court upheld a civil contempt finding. Although the proceedings were challenged by the contemnors as being criminal in nature, the court's analysis of this issue was incomplete, failing to recognize the limitations upon a court's power to impose a coercive sanction absent a present violation of the court's order.
The dissent also cites Dobbs, supra, 56 Cornell L R 239-240, as authority. In that article Professor Dobbs sets forth two hypothetical orders prohibiting defendants from engaging in certain conduct.
The second hypothetical order involves an injunction similar to that in the present case: an order enjoining trespass for all future times. According to Professor Dobbs, "[i]f a defendant so enjoined violates the order once, there is still something left to coerce; a civil contempt would therefore be appropriate since it could be used to compel compliance for the future...." Id., 240.
However, in a later work, Professor Dobbs retreats from his statement that it is appropriate to coerce future conduct when the violation of the injunction has occurred only in the past. He uses a similar May Day hypothetical case in his treatise on remedies. This time the defendant is enjoined from marching in a May Day parade. Again, Professor Dobbs states that a criminal sanction is the only permissible sanction should defendant violate the injunction since "there is nothing left to coerce." Dobbs, Remedies, p 98. What is interesting is that Professor Dobbs does not contend that a violation of an order enjoining trespass at all future times may be remedied by a coercive sanction in order to compel future compliance. Rather, Professor Dobbs uses two hypothetical cases that involve a present violation of a court's order, as opposed to a present duty and only a past violation of the order:
On the other hand, if the defendant is enjoined from using the plaintiff's trade name, or ordered to turn over property to the plaintiff, and he disobeys either injunction, a coercive or remedial sanction  which is to say, a "civil" one  is appropriate. The judge also has the power to vindicate the court's authority at the same time, and he might decide to include criminal punishment either in addition to the coercive order, or instead of it. This may not be advisable; it is probably unnecessary and it adds complications. [Id.]
We reject Professor Dobbs' earlier view that it is proper to coerce future conduct absent a present violation of a court's order as erroneous and without authoritative support. It is erroneous for the simple reason that where there is compliance with the order, there is nothing left to coerce.
[20] In addition, the requirement of a promise to abide by the injunction in the future in order to purge past misconduct raises serious First Amendment concerns which we need not address here.
[21] Among the factors to be considered by a court in imposing a fine for criminal contempt is "the necessity of effectively terminating the defendant's defiance as required by the public interest, and the importance of deterring such acts in the future." United Mine Workers, supra, 303. Likewise, in considering the length of imprisonment for criminal contempt, a judge may properly consider the contemnor's expressed willingness not to violate the order in the future. The courts of this state have ample authority to punish for past misconduct, but, in a civil contempt proceeding, they are not empowered to coerce an individual into compliance unless there is a present violation of the court order.

We do not address the issue whether the thirty-day limitation of MCL 600.1715(1); MSA 27A.1715(1) for criminal contempt improperly restricts a court's common-law power to punish for contempt. See n 14 supra. Furthermore, any argument that the thirty-day limitation on incarceration is insufficient to dissuade persons from repeated violations of the same court order should be addressed to the Legislature.
[1] The majority's claim that Professor Dobbs subsequently retreated from this position is utterly without merit. See ante, pp 103-104, n 19. Although Professor Dobbs does not repeat the hypothetical trespass in the passage referred to in his treatise on remedies, he clearly does not renounce his previous contention that coercive sanctions are appropriate to compel future compliance with a valid court order. Professor Dobbs makes no distinction whatsoever between present and past violations of an injunctive order.