# STATE OF MICHIGAN

# COURT OF APPEALS

RODENE JOY CASSIDY,

        Plaintiff/Counter-Defendant-
Appellee,

v

ROBERT FRANCIS CASSIDY, JR.,

        Defendant/Counter-Plaintiff,

and

MARY HANSEN,

        Defendant-Appellant.

FOR PUBLICATION
January 10, 2017
9:00 a.m.

No. 328004
Genesee Circuit Court
LC No. 12-306259-DO

RODENE JOY CASSIDY,

        Plaintiff/Counter-Defendant-
Appellee,

v

ROBERT FRANCIS CASSIDY, JR.,

        Defendant/Counter-Plaintiff –
Appellant,

and

MARY HANSEN,

        Defendant.

No. 328024
Genesee Circuit Court
LC No. 12-306259-DO

RODENE JOY CASSIDY,

        Plaintiff/Counter-Defendant-
Appellee,

-1-

v                                              No.  333319
                                               Genesee Circuit Court
ROBERT FRANCIS CASSIDY, JR.,                   LC No.  12-306259-DO

             Defendant/Counter-Plaintiff –
             Appellant.

_____

Before:  K. F. KELLY, P.J., and GLEICHER and SHAPIRO, JJ.

K. F. KELLY, P.J.

        In Docket No. 328004, Mary Hansen (Hansen) appeals by right the judgment of divorce, claiming, among other things, that she was entitled to a jury trial on plaintiff's third-party claim against her.  In Docket No. 328024, defendant appeals by right the same order, challenging the division of the marital estate, spousal support, and an award of attorney fees.  In Docket No. 333319, defendant challenges by delayed application for leave to appeal a contempt order requiring defendant to spend 10 days in jail unless or until he purged himself of contempt by paying plaintiff's attorney fees.  Finding no errors warranting reversal, we affirm in all three cases.

## I.  BASIC FACTS

        Plaintiff and defendant were married on June 7, 1997.  They both were previously married and have adult children with their former spouses, but did not have children with one another.  Plaintiff filed for divorce in October 2012 after confirming that defendant had been having an affair with Hansen, his former co-worker.  After the proceedings began, plaintiff learned that in the two years before plaintiff filed for divorce defendant had given Hansen hundreds of thousands of dollars toward the purchase and remodeling of a home on East Ellen Street in Fenton, Michigan.  Plaintiff estimated that defendant had given Hansen over $500,000.  Defendant readily admitted that Hansen received over $300,000.  Early in the proceedings, defendant claimed that the money represented Hansen's "wages."  Later, defendant argued that the money was simply his form of "consumption" of marital property.  However, by the time of trial, defendant classified the money as a "loan" that he fully expected her to pay back.

        Much of the divorce trial was focused on whether defendant and Hansen, who had been named as a defendant, conspired to defraud plaintiff of her share of the marital estate.  Defendant believed that the breakdown of the marriage came as a result of plaintiff's drug use and gambling such that there was "enough blame to go around."  He agreed that the money he "loaned" to Hansen should be considered part of the marital estate, but denied that he and Hansen acted in concert to thwart plaintiff's share of the marital estate.  Defendant freely acknowledged his infidelity, but denied that the affair with Hansen began before the summer of 2012.

        In contrast, plaintiff argued that the affair likely began back in 2009 when Hansen and defendant worked together at Signature Management Team (Signature).  Plaintiff believed that

defendant funneled money to Hansen with the purpose of depriving plaintiff of her share of the marital estate. Plaintiff claimed to be generally ignorant of the parties' financial situation, having no idea just how much defendant earned or what he did with the money over the course of their marriage. Early in their marriage, defendant sold his company, Lube Zone, for a substantial profit. Plaintiff believed that when the parties spent money, it was from the proceeds of the sale.

Following 15 days of testimony and argument, Genesee Circuit Court Judge F. Kay Behm found that defendant and Hansen engaged in concerted activity and conspired to defraud plaintiff of her rightful share in the marital estate. The trial court ordered, inter alia, that a constructive trust existed over the East Ellen Street home.

In Docket No. 328004, Hansen appeals as of right the judgment of divorce, claiming that the trial court erred in failing to grant Hansen summary disposition on plaintiff's claim under the Uniform Fraudulent Transfer Act (UFTA), MCL 566.31 et seq. Specifically, Hansen argues that the UFTA does not apply to the circumstances of this case because plaintiff was not a creditor at the time of the transfer and there was no active concealment of assets. Hansen further argues that the trial court erred in striking Hansen's jury demand. Alternatively, Hansen argues that the trial court erred in requiring Hansen to pay back more than the loan amount and in placing a lien in favor of ConRadical, who was a non-party to the divorce action.

In Docket No. 328024, defendant appeals the same order, challenging the division of the marital estate, which included substantial tax liability as a result of significant under-reporting of income for a number of years. Rather than treat the tax liability jointly, the trial court determined that defendant was solely responsible for the tax burden and that plaintiff was, in effect, an innocent spouse. Defendant also challenges the $1,000 a month spousal support order, as well as an award of over $150,000 in attorney fees to plaintiff.

Finally, in Docket No. 333319, by delayed application for leave to appeal, defendant challenges a later contempt order requiring him to spend 10 days in jail until he paid plaintiff's attorney fees. The trial court previously found defendant in civil contempt of court based on his failure to pay spousal support, failure to pay plaintiff's attorney fees, and failure to pay the property settlement. Defendant argues that he was denied due process because he did not receive notice of the possibility that he would be incarcerated and because the trial court's written order was harsher than the trial court's oral pronouncement. He asks that the matter be remanded before a different judge.

The appeals have been consolidated to facilitate appellate review.

## II. DOCKET NO. 328024

## 1. SPOUSAL SUPPORT

The trial court made the following detailed findings of fact:

34. The Court finds that the past relations and conduct of the parties favors Ms. Cassidy in this case because she worked full time at General Motors for 30 years, helped raise Mr. Cassidy's daughter, was faithful to her husband,

-3-

supported Mr. Cassidy for many years during the marriage where he reported no income while Mr. Cassidy lied about the affair with Ms. Hansen, transferred hundreds of thousands of dollars from the marital estate into Ms. Hansen's possession, custody and control to purchase, remodel, expand and furnish the Pond House, later using the equity in that property to purchase a lot on Mackinaw [sic] Island and repeatedly lied in this case in affidavits, his trial testimony and in other representations to the Court.

35.     The Court finds that the parties have been married for just under 18 years.

36.     The Court finds that Mr. Cassidy has the ability and education to work and make a substantial income, whereas Ms. Cassidy had a 30 year career at General Motors from which she retired, her skills no longer make her readily employable in a meaningful capacity, her age of 58 is a detriment to her finding any significant employment and her health having suffered [a] stroke and being hospitalized for 6 days during trial, as well as having a heart monitor surgically implanted in her chest militate against her obtaining any significant employment.

37.     The Court finds that Ms. Cassidy's superior financial condition at the time of the marriage and her steady employment enabled Mr. Cassidy to work as he desired although most of his entrepreneurial efforts were not successful. Mr. Cassidy is employable with his education and experience.

38.     The Court finds that Ms. Cassidy is 58 and Mr. Cassidy is 53.

39.     The Court finds that Mr. Cassidy has the ability to pay spousal support and that he is intentionally under employed. Mr. Cassidy can earn at least $100,000 per year given his experience and education. Ms. Cassidy does not have the ability to pay spousal support. Ms. Cassidy earns approximately $36,000 and has the ability to earn a relatively small additional amount through part-time and/or minimum wage employment.

40.     The Court finds that the present situation of the parties weighs in favor of Ms. Cassidy being awarded spousal support.

41.     The Court finds that Ms. Cassidy needs spousal support to maintain a reasonable standard of living and Mr. Cassidy has the ability to pay spousal support.

42.     The Court finds that Mr. Cassidy testified regarding some recent health concerns that arose during the trial, however, there was no testimony that any of his health issues are preventing him from obtaining meaningful gainful employment. Ms. Cassidy, however, suffers from diabetes, has a narrowing of her carotid arteries, recently suffered a stroke and has had a heart monitor surgically transplanted in her chest.

43.     The Court finds that the prior standard of living of the parties, which Mr. Cassidy still enjoys in part due to his relationship with Ms. Hansen and living in her home bought with Cassidy family money free of charge (at least until the Fenton home became encumbered by the two home equity loans in the spring and summer of 2014), while Ms. Cassidy is homeless and has moved twice since selling the former marital home now living with a friend, weighs in favor of Ms. Cassidy being awarded spousal support. Neither party has legal obligations to support others. The Michigan Supreme Court has held that spousal support should be awarded in an amount sufficient to ensure that the wife is not deprived of her right to support and at a level commensurate with that which she would have enjoyed had the marriage survived.

44.     The Court finds that Ms. Cassidy contributed substantially to the joint estate sharing her premarital home equity with Mr. Cassidy and permitting him to earn nothing for several years of the marriage, while he unsuccessfully worked on projects that never materialized or generated any meaningful income to the family. Mr. Cassidy contributed significantly to the marriage when he was receiving the RMR Development, LLC stream of payments and he hid them from Ms. Cassidy.

45.     The Court finds that Mr. Cassidy is at fault in causing the divorce, while he and Ms. Hansen are at fault in increasing the costs of prosecuting this case because of their conduct, both before and while this case has been pending including, but not limited to, lying to the Court, failing to fully and accurately respond to discovery requests and misleading Ms. Cassidy and the Court.

46.     The Court finds that Mr. Cassidy has been living with Ms. Hansen in the Fenton property since at least October 2012 and this cohabitation has enabled him not to obtain full time employment.

47.     The Court finds that general principles of equity strongly weigh in favor of Ms. Cassidy being awarded spousal support.

48.     The Court finds that there are others factors relevant to this case supporting an award of spousal support including 1) Mr. Cassidy and Ms. Hansen have effectively eliminated any possibility for using the Fenton Pond House property to obtain a loan to restore some of the transferred marital assets to Ms. Cassidy; 2) other marital assets may have either been depleted or sufficiently hidden that they cannot be discovered; and 3) Ms. Cassidy supported Mr. Cassidy during his years of attempting to develop his own businesses.

49.     The Court therefore finds that Ms. Cassidy is entitled to spousal support, until her death or remarriage or until further order of the Court, whichever occurs first, which shall be tax deductible to Mr. Cassidy and taxable income to Ms. Cassidy under the Internal Revenue Service code.

Our Court has detailed the standard for reviewing a spousal support award:

-5-

It is within the trial court's discretion to award spousal support, and we review a spousal support award for an abuse of discretion. . . . An abuse of discretion occurs when the trial court's decision falls outside the range of reasonable and principled outcomes. The object in awarding spousal support is to balance the incomes and needs of the parties so that neither will be impoverished; spousal support is to be based on what is just and reasonable under the circumstances of the case. We review for clear error the trial court's factual findings regarding spousal support. A finding is clearly erroneous if, after reviewing the entire record, we are left with the definite and firm conviction that a mistake was made. If the trial court's findings are not clearly erroneous, we must determine whether the dispositional ruling was fair and equitable under the circumstances of the case. We must affirm the trial court's dispositional ruling unless we are convinced that it was inequitable. [*Loutts v Loutts*, 298 Mich App 21, 25-26; 826 NW2d 152 (2012) (internal quotation marks and citations omitted).]

The trial court's spousal support award was not an abuse of discretion. MCL 552.23(1) provides:

Upon entry of a judgment of divorce or separate maintenance, if the estate and effects awarded to either party are insufficient for the suitable support and maintenance of either party and any children of the marriage who are committed to the care and custody of either party, the court may also award to either party the part of the real and personal estate of either party and spousal support out of the real and personal estate, to be paid to either party in gross or otherwise as the court considers just and reasonable, after considering the ability of either party to pay and the character and situation of the parties, and all the other circumstances of the case.

While a trial court's decision to award spousal support is not subject to any rigid formula and should reflect what is reasonable and just under the circumstances of each case, *Loutts*, 298 Mich App at 30, a trial court should consider:

(1) the past relations and conduct of the parties, (2) the length of the marriage, (3) the abilities of the parties to work, (4) the source and amount of property awarded to the parties, (5) the parties' ages, (6) the abilities of the parties to pay alimony, (7) the present situation of the parties, (8) the needs of the parties, (9) the parties' health, (10) the prior standard of living of the parties and whether either is responsible for the support of others, (11) contributions of the parties to the joint estate, (12) a party's fault in causing the divorce, (13) the effect of cohabitation on a party's financial status, and (14) general principles of equity. [*Myland v Myland*, 290 Mich App 691, 695; 804 NW2d 124 (2010), quoting *Olson v Olson*, 256 Mich App 619, 631; 671 NW2d 64 (2003).]

Additionally, "[t]he voluntary reduction of income may be considered in determining the proper amount of alimony." *Moore v Moore*, 242 Mich App 652, 655; 619 NW2d 723 (2000). "If a court finds that a party has voluntarily reduced the party's income, the court may impute

additional income in order to arrive at an appropriate alimony award." *Id.* In order to aid in appellate review, a trial court should make specific factual findings as to each of the relevant factors. *Myland*, 290 Mich App at 695.

The trial court imputed an income in the amount of $100,000 upon defendant. Defendant now complains that this was unfair, but he assented to and, in fact, requested that the trial court impute that amount. On the first day of trial, defense counsel requested: "we ask that you impute his income to $100,000.00 to $120,000.00 per year."

> "Invited error" is typically said to occur when a party's own affirmative conduct directly causes the error. For example, in *Vannoy v City of Warren*, 386 Mich 686, 690; 194 NW2d 304 (1972), this Court explained that a party cannot seek appellate review of an instruction that he himself requested, saying, "Assuming error as claimed, that error comes within the purview of what of tradition and common sense is known as 'invited error.' " Appellate review is precluded because when a party invites the error, he waives his right to seek appellate review, and any error is extinguished. [*People v Jones*, 468 Mich 345, 352 n 6; 662 NW2d 376 (2003).]

Similarly in the context of judicial estoppel, "[i]t is settled that error requiring reversal may only be predicated on the trial court's actions and not upon alleged error to which the aggrieved party contributed by plan or negligence." *Lewis v LeGrow*, 258 Mich App 175, 210; 670 NW2d 675 (2003). In any event, even if defendant had not requested this particular amount, the trial court was within its right to impute such an income on defendant, who holds a Harvard M.B.A. and is eminently employable. Defendant consistently earned well over $100,000 – reported, unreported, or otherwise – throughout the parties' marriage.

To the extent defendant complains that the trial court erred in assessing fault and in determining the relative health of both parties, these issues go to the credibility of the witnesses. "We defer to the special ability of the trial court to judge the credibility of witnesses." *In re White*, 303 Mich App 701, 711; 846 NW2d 61 (2014).

## 2. DISTRIBUTION OF THE MARITAL ESTATE

Our Court has noted:

> In deciding issues on appeal involving division of marital property, this Court first reviews the trial court's findings of fact. Findings of fact, such as a trial court's valuations of particular marital assets, will not be reversed unless clearly erroneous. A finding is clearly erroneous if, after a review of the entire record, the reviewing court is left with the definite and firm conviction that a mistake was made. If the trial court's findings of fact are upheld, this Court must decide whether the dispositive ruling was fair and equitable in light of those facts. The dispositional ruling is discretionary and will be affirmed unless this Court is left with a firm conviction that the division was inequitable. [*Butler v Simmons-Butler*, 308 Mich App 195, 207–208; 863 NW2d 677 (2014).]

Equity serves as the goal for property division in divorce actions. *Sparks v Sparks*, 440 Mich 141, 159; 485 NW2d 893 (1992). Although marital property need not be divided equally, it must be divided equitably in light of a court's evaluation of the parties' contributions, faults and needs. *Id.* at 159.

> We hold that the following factors are to be considered wherever they are relevant to the circumstances of the particular case: (1) duration of the marriage, (2) contributions of the parties to the marital estate, (3) age of the parties, (4) health of the parties, (5) life status of the parties, (6) necessities and circumstances of the parties, (7) earning abilities of the parties, (8) past relations and conduct of the parties, and (9) general principles of equity. There may even be additional factors that are relevant to a particular case. For example, the court may choose to consider the interruption of the personal career or education of either party. The determination of relevant factors will vary depending on the facts and circumstances of the case. [*Id*. at 159-160 (citation omitted).]

The trial court must consider all relevant factors but "not assign disproportionate weight to any one circumstance." *Id*. at 158. This Court defers to a trial court's findings of fact stemming from credibility determinations. *Id.* at 147.

Defendant complains that the trial court gave undue weight to defendant's fault. "Marital misconduct is only one factor among many and should not be dispositive." *Sparks*, 440 Mich at 163. Instead, fault should be considered "in conjunction with all the other relevant factors." *Id.* Fault "is not a punitive basis for an inequitable division." *McDougal v McDougal*, 451 Mich 80, 90; 545 NW2d 357 (1996). Here, it is clear that the trial court did not give undue weight to defendant's fault for the breakdown of the marital relationship. That defendant engaged in an extramarital affair and was the cause of the breakdown of the marriage is not seriously in dispute, despite defendant's attempt to paint plaintiff as what can only be described as a marijuana-hazed casino junkie. Moreover, the trial court was not focused only on defendant's extramarital affair, but was focused on defendant's *conduct* both during and after the parties' separation which involved a concerted attempt to conceal marital assets. Additionally, the trial court did not merely focus on defendant's poor behavior, but also considered a number of other factors, including the parties' disparate earning ability, the parties' disparate health issues, and the parties' contributions to the marital estate. If anything, the trial court took great pains to evenly distribute the marital estate in spite of its finding that plaintiff was entitled to the greater share.

To the extent that defendant argues that the trial court erred in making him solely responsible for the parties' tax liability, we find the issue to be moot where defendant has received the relief he requested. *B P 7 v Bureau of State Lottery*, 231 Mich App 356, 359; 586 NW2d 117, 119 (1998) ("An issue is deemed moot when an event occurs that renders it impossible for a reviewing court to grant relief.") In his appellate brief, defendant requested that "the tax liability provision be ordered eliminated from the Judgment of Divorce allowing the IRS to do an independent investigation that would be binding on the parties." Although the provision has not been stricken, plaintiff had demonstrated through a permitted expansion of the record that an IRS investigation was completed and that she enjoys the status of an innocent spouse.

## 3. ATTORNEY FEES

"We review for an abuse of discretion a trial court's award of attorney fees in a divorce action." *Richards v Richards*, 310 Mich App 683, 699; 874 NW2d 704 (2015). An abuse of discretion occurs when the result falls outside the range of principled outcomes. *Keinz v Keinz,* 290 Mich App 137, 141; 799 NW2d 576 (2010). "Findings of fact on which the trial court bases an award of attorney fees are reviewed for clear error." *Richards*, 310 Mich App at 700. "A finding is clearly erroneous if we are left with a definite and firm conviction that a mistake has been made." *Gates v Gates*, 256 Mich App 420, 432–433; 664 NW2d 231 (2003).

Although defendant seems to argue that, as a matter of law, he was entitled to an evidentiary hearing on the issue of attorney fees, he does not dispute that the attorney's hourly rate was reasonable nor does he dispute that the number of hours the attorney spent on the case was reasonable. Instead, defendant's argument is narrowly focused. He contends that: (1) he should not be responsible for paying fees that were incurred as a result of a third party's misconduct (Hansen); and, (2) he should not be responsible for paying fees that resulted from plaintiff's civil action against Hansen. Neither of these claims has merit. A review of the record reveals that the trial court concentrated on *defendant's* vexatious behavior during the divorce proceeding. Additionally, although Hansen was named as a third party, the entire proceeding was a "divorce proceeding" because litigation was focused primarily on the East Ellen home and determining whether it should be considered part of the marital estate.

MCL 552.13(1) provides that a trial court may require a party "to pay any sums necessary to enable the adverse party to carry on or defend the action." Likewise, MCR 3.206(C) provides:

> (1) A party may, at any time, request that the court order the other party to pay all or part of the attorney fees and expenses related to the action or a specific proceeding, including a post-judgment proceeding.
>
> (2) A party who requests attorney fees and expenses must allege facts sufficient to show that
>
> (a) the party is unable to bear the expense of the action, and that the other party is able to pay, or
>
> (b) the attorney fees and expenses were incurred because the other party refused to comply with a previous court order, despite having the ability to comply.

In a divorce action, attorney fees are "awarded only as necessary to enable a party to prosecute or defend a suit but are also authorized when the requesting party has been forced to incur expenses as a result of the other party's unreasonable conduct in the course of litigation." *Richards*, 310 Mich App at 700 (internal quotation marks omitted). As such, "MCR 3.206(C)(2) provides two independent bases for awarding attorney fees and expenses . . .Whereas MCR 3.206(C)(2)(a) allows payment of attorney fees based on one party's inability to pay and the other party's ability to do so, MCR 3.206(C)(2)(b) considers only a party's behavior, without reference to the ability to pay." *Richards*, 310 Mich App at 701. Therefore, MCR 3.206(C)(2)(b) is focused on a party's bad behavior. The *Richards* Court cited with authority the court rule's staff comments:

The April 1, 2003, amendment of MCR 3.206(C), effective September 1, 2003, was suggested by the Michigan Judges Association to (1) reduce the number of hearings that occur because of a litigant's vindictive or wrongful behavior, (2) shift the costs associated with wrongful conduct to the party engaging in the improper behavior, (3) remove the ability of a vindictive litigant to apply financial pressure to the opposing party, (4) create a financial incentive for attorneys to accept a wronged party as a client, and (5) foster respect for court orders. [*Richards*, 310 Mich App at 701.]

Contrary to defendant's claims, the trial court did not award attorney fees based *only* on defendant's alleged wrong-doing; instead, the trial court found that *both* provisions of the court rule were at play. It was plaintiff's inability to pay (and defendant's ability to pay) coupled with defendant's conduct that caused the trial court to award plaintiff her attorney fees. In its findings of fact, the trial court noted:

69. The Court finds that in domestic relations cases, attorney fees are authorized by both statute and court rule. Attorney fees may be awarded when a party needs financial assistance to prosecute or defend the suit. "An award of legal fees in a divorce action is authorized when it is necessary to enable the party to carry on or defend the suit." Legal fees "may also be awarded when the party requesting payment has been forced to incur them as a result of the other party's unreasonable conduct in the course of the litigation." That is, "a party should not be required to invade assets to satisfy attorney fees when the party is relying on the same assets for support."

70. The Court finds all three of the above factors exist in this case. First, Ms. Cassidy's $36,600 annual pension is insufficient to prosecute a case of this magnitude. Second, the vast majority of the expenses incurred in this case are a direct result of the misconduct of Mr. Cassidy and Ms. Hansen. Third, Ms. Cassidy has been forced to not only invade her separate and marital property within her control to pay her attorney fees, but those assets are now depleted and Ms. Cassidy is in debt to her counsel in the amount of $103,500.88 through April 15, 2015.

71. The Court finds that where there is a claim of misconduct justifying an award of attorney fees, as there is in this case, the Court must find that the party's conduct was unreasonable, that a causal connection existed between that misconduct and the fees incurred, and the fees incurred were reasonable. Things like providing false interrogatory answers, violation of a court order compelling discovery, signing a document in violation of the court rules, and filing frivolous claims or defenses, all justify the Court exercising its discretion and awarding attorney fees if they are "reasonable" or "actual." In an appropriate case, fees due to misconduct can be in the hundreds of thousands of dollars.

72.     The Court finds Mr. Cassidy's conduct here has been unreasonable and it was a substantial cause of the fees and expenses incurred by Ms. Cassidy in prosecuting this case.

73.     The Court finds the court rule requires that the party requesting the fees must allege facts sufficient to show that he or she is "unable to bear the expense of the action, and that the other party is able to pay." A determination that a party is entitled to attorney fees does not decide the amount of the award. In determining the reasonableness of attorney fees, a trial court should consider the professional standing and experience of the attorney, the skill and labor involved, the amount in question and the results achieved, the difficulty of the case, the expenses incurred, and the nature and length of the professional relationship with the client. Generally, no evidentiary hearing is necessary when there is an otherwise-sufficient record to support a finding of reasonableness.

***

76.     The Court finds Ms. Cassidy receives approximately $36,600 per year from her retirement pension before deductions for taxes, medical and dental coverage and life insurance. On the other hand, Mr. Cassidy is an entrepreneur who had multiple business interests and who, by his own admission, has diverted funds of at least $364,000 to Ms. Hansen (not including the $70,000 from ConRadical), while keeping details of family resources, expenses and assets secret from Ms. Cassidy.

77.     The Court finds Mr. Cassidy's January 2012 credit application indicates he made $200,000 per year . . .and one year later a similar application indicated he made $150,000 per year . . .while two affidavits he signed claimed he only made $52,000 per year. More importantly, however, his documented W-2 income in 2012 was $144,822 and in 2013 was $120,111. . . .Mr. Cassidy also received $132,942 from RMR in 2012.

78.     The Court finds Mr. Cassidy, on the other hand, has claimed for almost two years that he is not employed and has been unable to find employment despite having a mechanical engineering degree from Michigan Tech and an MBA from Harvard Business School.

79.     The Court finds Mr. Cassidy's claim that he cannot find employment in an expanding economic environment is not credible.

80.     The Court finds that in order for Ms. Cassidy to be effectively represented and obtain her fair share of the marital assets, spousal support and payment of her attorney fees, she needed to retain a highly qualified, tenacious and experienced family law litigator to discover what Mr. Cassidy sought to hide and cover-up.

***

84. The Court finds in September of 2013 a stipulated order was entered permitting Ms. Cassidy to sell the former marital home and certain portions of the proceeds were considered her separate property.

85. The Court finds with that separate property, Ms. Cassidy bought a vacant lot for $72,722 upon which she intended to build a new home, because she is now homeless, and deposited the remaining $94,238 in the bank to build the home.

86. The Court finds that, unfortunately, Mr. Cassidy has successfully caused Ms. Cassidy to spend the remaining balance from the sale of the martial home, plus more, to prosecute this case.

***

88. The Court finds Ms. Cassidy did not have the ability to retain her counsel because of the unique circumstances of this case and the efforts to which Mr. Cassidy has gone to deceive his wife and this Court. Ms. Cassidy was kept in the dark with regard to financial matters in connection with this marriage. Accordingly, she needed the assistance of an experienced family law practitioner to assist in the investigation and prosecution of this case.

89. The Court finds this has been a difficult, time-consuming and laborious case primarily because of the conduct of Mr. Cassidy and Ms. Hansen. By way of example, the Court made an extraordinary decision to issue an ex-parte order for seizure of computers, which has resulted in significant information being disclosed that otherwise would have been hidden from Ms. Cassidy, but took considerable time, effort and legal expertise to research and present to the Court before such an order could even be considered. A considerable amount of time has been spent on frivolous matters raised by Mr. Cassidy like requests to modify the interim order entered by this Court without factual support or justification; having to obtain an order for alternate service because Ms. Hansen was intentionally avoiding being served; requesting show causes against Mr. Cassidy for not providing discovery in a timely manner that was so bad this Court ultimately took it upon itself to show cause the non-parties refusing to honor subpoenas; having to ask the Court for permission to remediate the home following a flood when Mr. Cassidy confiscated the underinsured insurance proceeds check and forged Ms. Cassidy's name on it so there was no money to fix the basement; replying to a request for a personal protection order; replying to a motion for a protective order by Ms. Hansen as to some initial discovery requests that were rejected with the exception of production of Ms. Hansen's Social Security number and one other minor item; responding to a request that Ms. Cassidy submit to substance abuse testing, which she stipulated to, but which Mr. Cassidy never followed through on in spite of the stipulated order; replying to a request to exclude potential witnesses from the courtroom; considerable time and effort related to the scheduling of the deposition of Ms. Cassidy's daughter's deposition on two occasions that were then canceled each time by Mr. Cassidy;

and numerous other such exercises in gamesmanship, rather than addressing the substantive issues in an upstanding and forthright manner.

*\*\**

96.    The Court finds Ms. Cassidy would not have been able to uncover all of the lies and deceit committed by her husband and Ms. Hansen without the assistance of such a highly qualified family law litigator on her retirement pension of approximately $36,600 per year before taxes, insurance and other routine deductions. Moreover, the court rule authorizes the payment of attorney fees and expenses where the other party refused to comply with a court order, despite having the ability to do so, which has been a major problem in this case. Similarly, case law authorizes an award of attorney fees and expenses necessitated by the improper conduct of the opposing spouse and the record is replete with instances of such conduct by Mr. Cassidy. In this case, Ms. Cassidy earns approximately $500 per week from her retirement pension before deductions for taxes, medical and dental coverage and life insurance. On the other hand, Mr. Cassidy is an entrepreneur who had several business interests and who has diverted funds to his employee/girlfriend, while keeping details of family resources, expenses and assets secret from Ms. Cassidy.  [Appendix B (footnotes omitted).]

Defendant argues that the record does not support the trial court's award of attorney fees because the trial court improperly focused on a non-party to the divorce case, Mary Hansen. However, it is clear from the trial court's findings that the trial court was not focused on Hansen's conduct, but on *defendant's* conduct, which happened to include Hansen at times, but also included bad behavior independent of Hansen, such as failing to comply with discovery, lying to the court, trading in his Cadillac for a Volt without court permission, failing to pay spousal support, failing to pay the mortgage on the marital home, dissolving ConRadical without court permission, and hiding proceeds of the sale of his H-1 Hummer.  The trial court concentrated on *defendant's* continuous deception and pattern of behavior.

We likewise reject defendant's attempt to argue that attorney fees were unwarranted because there was a civil complaint against Hansen.  As will be discussed in more detail below, in order to properly distribute the marital estate, the trial court had to first determine the estate's assets, including deciding how to handle the East Ellen home.  Therefore, no matter how it was labeled, the entire proceeding was still a "divorce proceeding" to determine the size and distribution of the marital estate.

Finally, defendant also complains, in the most cursory fashion imaginable, that the trial court erred in failing to conduct an evidentiary hearing on the reasonableness of the fees.  The entirety of his argument is as follows:

These[1] are legitimate concerns that not only were the attorney fees not related to the divorce between the parties, but that was error not to conduct a hearing on the reasonableness of the fees incurred.

\*\*\*

These attorney fees were obviously challenged by Defendant-Appellant. In his final summation Defendant-Appellant's divorce attorney argued:

> In 15 days of trial and several days of testimony by Ms. Cassidy, I've heard about attorney fees and how attorney fees are a burden but when you look at the case law and court rule regarding attorney fees, you have to have some showing of the reasonableness, what they're used for, things like that. There was no testimony, whatsoever, from Ms. Cassidy as to what her final attorney bill is, what the money was spent on, therefore, obviously, no opportunity for me to cross-exam or challenge those attorney fees. There was never an attorney fee requested on the record by Ms. Cassidy. Anything that you have in the proposed findings of fact and conclusions of law doesn't matter. They have to testify as to what is necessary. You can't say, well, 15 days of trial, that – that's sounds reasonable to me. I have no ability to cross-exam whatsoever.

The attorney fees were erroneously awarded to Plaintiff-Appellee. The matter must be reversed.

In the lower court, defendant never challenged either the hourly rates or the work performed, concentrating primarily on the "non-divorce" argument. The affidavits and copious billings submitted by plaintiff and presented to the trial court were not contested either. As such, the issue could be deemed to be abandoned. We will nevertheless address defendant's argument.

"Where . . .the party opposing the taxation of costs challenges the reasonableness of the fee requested, the trial court should inquire into the services actually rendered before approving the bill of costs." *Miller v Meijer, Inc*, 219 Mich App 476, 479; 556 NW2d 890 (1996). However, there is no error in failing to conduct an evidentiary hearing if "the parties created a sufficient record to review the issue, and the court fully explained the reasons for its decision." *Head v Phillips Camper Sales & Rental, Inc*, 234 Mich App 94, 113; 593 NW2d 595 (1999).

The Court in *Smith v Khouri*, 481 Mich 519, 527; 751 NW2d 472 (2008), first detailed what trial courts have been doing when calculating attorney fees, such as using the factors found in *Wood v Detroit Automobile Inter-Ins Exch*, 413 Mich 573, 588; 321 NW2d 653 (1982), that were derived from *Crawley v Schick*, 48 Mich App 728, 737; 211 NW2d 217 (1973). The

---

[1] The argument that the attorney fees were not incurred in the "divorce" action.

factors are: (1) the professional standing and experience of the attorney; (2) the skill, time and labor involved; (3) the amount in question and the results achieved; (4) the difficulty of the case; (5) the expenses incurred; and (6) the nature and length of the professional relationship with the client. *Smith*, 481 Mich at 529. The *Smith* Court also recognized that many trial courts had been consulting the eight factors found in Rule 1.5(a) of the Michigan Rules of Professional Conduct, which are: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent. *Id.* at 529-530. The Supreme Court further noted that trial courts have not limited themselves to only consulting the factors listed above. *Id.* at 530.

Recognizing that "some fine-tuning" was required, the *Smith* Court instructed that when determining an attorney fee pursuant to MCR 2.403, trial courts should first determine the "reasonable hourly rate [which] represents the fee customarily charged in the locality for similar legal services," and the trial court should rely on "reliable surveys or other credible evidence of the legal market." *Id.* at 530-531. The Court emphasized that the burden is on the fee applicant to produce satisfactory evidence "that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Id.* at 531, quoting *Blum v Stenson*, 465 US 886, 895 n 11; 104 S Ct 1541; 79 L Ed 2d 891(1984). The Court then instructed that trial courts should multiply that number by the "reasonable number of hours expended in the case." *Smith*, 481 Mich at 531. The Court again emphasized that "[t]he fee applicant bears the burden of supporting its claimed hours with evidentiary support." *Id.* at 532. After this initial baseline figure has been calculated, "[i]n order to aid appellate review, a trial court should briefly discuss its view of the remaining [*Wood* and MRPC] factors" and whether such factors justify an upward or downward adjustment. *Id.* at 531.

Regarding the reasonableness of Wallach's fees, the trial court noted:

> 81. The Court finds counsel for Ms. Cassidy has been a family law practitioner for almost 36 years; is a member of the Family Law Section of the State Bar of Michigan; Chairperson of an Attorney Discipline Board hearing panel; twice been named a "Top Lawyer" by *dbusiness* Magazine in the areas of family law, general practice and business law, named Strathmore's Who's Who and by The Marquis Who's Who Publications Board. He is an equity partner in the national law firm of Foley & Mansfield, PLLP having approximately 145 lawyers nationwide in 10 offices in 8 states and is the managing partner of the Ferndale and Grand Rapids offices.

> 82. The Court finds Mr. Wallach has also served as the president of three community organizations, i.e. the Jewish Community Council of Metropolitan Detroit, Michigan Region of the Anti-Defamation League and the Michigan branch of the Israel Cancer Association. He recently completed his third

term in 10 years as president of the Farmington Public Schools Board of Education.

83. The Court finds all of the above speak to Mr. Wallach's qualifications and stature in the community, which have been acknowledged by this Court on several occasions in comments made addressing the quality and professionalism in the pleadings filed and presentation in this matter.

87. The Court finds that Ms. Cassidy's counsel's reduced hourly rate of $250 per hour for an attorney with over 35 years of experience handling domestic relations matters, the labor and skill involved, as well as the results already achieved in this case more than justify the amount requested for what has been necessary to continue to unravel the web of lies, deceit and cheating woven by Mr. Cassidy and Ms. Hansen.

***

90. The Court finds the State Bar conducts a scientific survey on the economics of the practice of law periodically that includes a multi-layered analysis of attorney fees charged by lawyers throughout the state in various areas of practice.

91. The Court finds the most recent State Bar report (the Report) was published in the Bar Journal in July 2014.

92. The Court finds the fees customarily charged in the locality can be established by testimony or empirical data found in surveys and other reliable reports . . .something more than anecdotal statements to establish the customary fee for the locality.

93. The Court finds the Report makes it clear the $250 per hour Ms. Cassidy is being charged is unquestionably reasonable. For example, the average hourly rate for a managing partner is $282 per hour; for an equity partner $333 per hour and for an attorney with between 31 and 35 years' experience is $276 per hour. Although Mr. Wallach's firm has about 145 attorneys nationwide, the Ferndale office has 13 attorneys, which if in a single office, means the average hourly rate is $290.

94. The Court finds geographically, the average hourly rate in Flint is $238, while for Genesee County the average hourly rate is $241. Statewide, family law attorneys average $221 per hour and those is [sic] the 75th percentile average $250. Mr. Wallach's current hourly rate for family law matters is $325.

95. The Court finds, therefore, the initial retainer of $2,500 and an hourly rate of $250 per hour was reasonable for Ms. Cassidy to pay to initiate this action. Moreover, those figures are in the middle to low range of fees charged by attorneys in Michigan according to the 2014 Economics of Law Practice Attorney Income and Billing Rates Summary Report.

-16-

97.    The Court therefore finds that Ms. Cassidy is entitled to an award of attorney fees and expenses for her unpaid attorney fees in the amount of $103,500.88 through April 15, 2015 to be paid by Mr. Cassidy. The Court also finds that Ms. Cassidy is entitled to an additional award of attorney fees and expenses to be paid by Mr. Cassidy in the amount of $44,119.00 which represents Ms. Cassidy's half of the marital property generated from the sale of the marital home (and spent on attorney fees) for a total of $150,619.88 in attorney fees awarded to Ms. Cassidy and against Mr. Cassidy.

The trial court provided a detailed explanation for why it awarded plaintiff attorney fees. Not only did plaintiff lack the ability to pay the fees without invading marital assets but she was also forced to incur an exorbitant amount of fees in prosecuting and defending the case as a result of defendant's bad behavior. As the trial court noted, "the Register of Actions documents an extraordinary number of motions (approximately 45) requiring approximately 12 hearing dates, approximately 6 mandatory settlement conferences, several other miscellaneous hearing dates, extensive briefing and various discovery disputes, not to mention 15 days of trial."   The trial court judge was all too familiar with every nuance of the case, having been the only judge to handle it over a number of years.  There was no error in failing to conduct an evidentiary hearing given the fact that there was a sufficient record to review the issue, and the court fully explained the reasons for its decision.

## III.  DOCKET NO. 328004

As a result of zealous representation and some creative legal arguments, Hansen's attorney led plaintiff's attorney and the trial court into an unnecessary dialogue regarding what "cause of action" was raised against Hansen and, once plaintiff settled on the UFTA, whether Hansen was entitled to a jury trial.  Those inquiries were unnecessary, given the trial court's express equitable power in the divorce proceeding to determine and distribute the marital estate. This power includes the ability to adjudicate issues that impact a third party's property rights. The trial court – as a matter of equity without a jury – may determine whether a third-party has acted in concert with a spouse to deprive the other spouse of her share of the marital estate.  If the answer is "yes," then the trial court may fashion a remedy to ensure an equitable division of marital assets.  In such a situation, there is no need to specify or enumerate a separate cause of action against the third party; instead, the action against the third party is incidental to the divorce.  Once this case is given proper context, Hansen's arguments regarding the UFTA and the right to a jury trial become superfluous.

"This Court has long recognized that the jurisdiction of a divorce court is strictly statutory and limited to determining the rights and obligations between the husband and wife, to the exclusion of third parties." *Estes v Titus*, 481 Mich 573, 582–583; 751 NW2d 493 (2008) (internal quotation marks omitted).  That general rule has an exception, however.  "When fraud is alleged, third parties can be joined in the divorce action only if they have conspired with one

spouse to defraud the other spouse of a property interest."[2]  *Id.* at 583.  In such circumstances, "[t]he door of the equity court is open to hear a claim that a fraud has been perpetrated on the court."  *Berg v Berg*, 336 Mich 284, 289; 57 NW2d 889 (1953).  *Berg* confirmed that "[t]hird persons may be made defendants in an action for divorce where it is charged that such persons have conspired with the husband with intent to defraud the wife out of her interest in property."  *Id.* at 288.  In *Berg*, trial court allowed a wife's sister to intervene so that she could demonstrate that the husband and the wife's guardian ad litem had committed fraud upon the trial court by withholding facts regarding the wife's involuntary confinement, as well as the nature and extent of the parties' assets.  *Berg* obviously addressed a situation different from the case at bar.  In *Berg*, the third party sought to intervene as a means of protecting her sister.  Here, the issue is whether Hansen was properly brought into the case.  Nevertheless, *Berg* clearly stands for the proposition that third parties may be involved in divorce proceedings when there has been fraud.

In *Smela v Smela*, 141 Mich App 602; 367 NW2d 426 (1985), a wife's parents brought a third-party action in a divorce proceeding, claiming that they had loaned the parties money to purchase their marital home.  The parents sought a lien on the home to secure the debt.  While the wife understood the money to be a loan, the husband had considered the money a gift.  *Id.* at 604.  At issue at trial was whether the money was a loan and how it was to be allocated upon divorce.  Although neither party challenged the trial court's jurisdiction over the third-party claim, this Court found "that question so basic as to be dispositive."  *Id.* at 605.  This Court determined that there was no basis for allowing the parents to intervene where they could have initiated an independent action to recover their loan.  *Id.*  Again, as in *Berg*, the third party sought to intervene in the divorce case, whereas here, Hansen was brought into the case against her will.  Nevertheless, the *Smela* Court reiterated that, while the general rule is that "[t]he circuit court has no jurisdiction in a divorce proceeding to adjudicate the rights of any party other than the husband and wife" and "Michigan divorce statutes do not permit the courts to order conveyance of property or interests in property to third parties," one exception exists "where a third party has conspired with a husband or a wife to defraud the other spouse out of his or her property rights."  *Id.*

In *Donahue v Donahue*, 134 Mich App 696; 352 NW2d 705 (1984), the trial court determined that the husband and his parents actively concealed assets from the wife.  Our Court determined that the trial court was within its right to adjudicate the rights of a third party:

> Although Dr. and Mrs. Donahue [the husband's parents] were not made parties to the suit, they were represented by counsel at trial, they testified at length, and they were cross-examined.  Likewise, their pretrial depositions were

---

[2] This concept is not new.  In a decision from the 1920's, our Supreme Court held that "divorce suits are special statutory proceedings, limited to litigating domestic relations between husband and wife, to the exclusion of third parties, who can only be brought in as defendants where it is alleged that they have conspired with the husband to transfer property subject to plaintiff's claim for alimony with intent to defraud her."  *Przeklas v Przeklas*, 240 Mich 209, 212; 215 NW 306 (1927).

used in examination. Accordingly, we hold that the trial court was well within its jurisdiction and right to determine whether Dr. Donahue and his wife or defendant were the owners of the certificate of deposit and the bearer bonds. [*Id.* at 705.]

Ultimately, this Court held that the trial court correctly concluded that the certificates bore sufficient indicia of ownership that justified the trial court's finding that they belonged to the husband and were, therefore, part of the marital estate. *Id.* at 706-708.

In *Wiand v Wiand*, 178 Mich App 137; 443 NW2d 464 (1989), the husband complained that the trial court erred in including assets in the marital estate that belonged to his brother. *Id.* at 146. This Court began its analysis by confirming that "[e]ven assuming that defendant's brother's rights were affected by this judgment of divorce, an exception to the rule that a court cannot affect the rights of nonparties is applicable when it is claimed that a third party has conspired with one spouse to deprive the other of his or her rightful interest in the marital estate." *Id.* The Court concluded:

> In this case, the lower court specifically found that defendant and his brother had conspired to deprive plaintiff of her rightful share of the marital estate. Defendant's brother was never made a party to the divorce action, and he was apparently not represented by counsel at trial. He did, however, testify at length at trial on at least two separate days and was subjected to thorough cross-examination. The major distinction between this case and *Donahue, supra,* was the lack of representation here. We are not convinced that that difference is significant in this case. Defendant's brother apparently knew about this divorce action well in advance of trial and knew of plaintiff's allegations that defendant possessed a legal or equitable interest in properties that defendant claimed were owned solely by his brother. Although the record does not reflect defendant's brother's educational background or his professional training, if any, it reveals that defendant's brother was a very knowledgeable and experienced businessman with an ownership interest in several corporations. We find that *Donahue* controls this case and allows for the inclusion in the judgment of a dispositive provision involving property allegedly owned by defendant's brother. Simply, we find no error in the lower court's determination as to which assets belong within the marital estate. [*Wiand*, 178 Mich App at 147–148 (emphasis added).]

In *Thames v Thames*, 191 Mich App 299; 477 NW2d 496 (1991), a husband created an irrevocable trust for the benefit of the parties' child, which included stock and a life insurance policy. Though the husband claimed that he set up the trust without knowing that the wife had filed for divorce, the trial court found otherwise and concluded that the husband had established the trust to place the particular assets beyond the wife's reach. *Id.* at 301. Our Court affirmed with the following analysis:

> A divorce case is equitable in nature, and a court of equity molds its relief according to the character of the case. Once the court acquires jurisdiction, it will do what is necessary to accord complete equity and to conclude the controversy. Generally, a court has no authority to adjudicate the rights of third parties in divorce actions. An exception to the general rule exists when it is claimed that a

third party has conspired with one spouse to deprive the other spouse of an interest in the marital estate. The court, therefore, has authority to find that assets were fraudulently transferred to a third party to deprive a spouse of an interest in marital property. It follows that another exception exists for situations like the one before us. One spouse cannot deprive the other of an interest in the marital estate by transferring marital property into a trust for the benefit of a third party. Having reviewed the record in this case, we are not left with a definite and firm conviction that a mistake has been committed. The trial court's findings are not clearly erroneous. Accordingly, we affirm the trial court's determination that the trust corpus was an asset of the marital estate subject to division between the parties. [*Id.* at 302 (internal citations omitted).]

Given that a trial court may adjudicate the rights of third parties even when they are not named as parties, as in *Donahue* and *Wiand*, it follows that there is no right to a jury trial when the third party has been named as a party. Instead, the trial court has the inherent authority to craft an outcome to create the equitable division of assets, even if that outcome touches upon a third party. "A divorce case is equitable in nature, and a court of equity molds its relief according to the character of the case; once a court of equity acquires jurisdiction, it will do what is necessary to accord complete equity and to conclude the controversy." *Schaeffer v Schaeffer*, 106 Mich App 452, 457; 308 NW2d 226 (1981). One such method is creation of a constructive trust. Our Supreme Court has described when it is appropriate to impose a constructive trust:

A constructive trust may be imposed where such trust is necessary to do equity or to prevent unjust enrichment. Hence, such a trust may be imposed when property has been obtained through fraud, misrepresentation, concealment, undue influence, duress, taking advantage of one's weakness, or necessities, or any other similar circumstances which render it unconscionable for the holder of the legal title to retain and enjoy the property. Accordingly, it may not be imposed upon parties who have in no way contributed to the reasons for imposing a constructive trust. The burden of proof is upon the person seeking the imposition of such a trust. [*Kammer Asphalt Paving Co, Inc v E China Twp Sch*, 443 Mich 176, 188; 504 NW2d 635 (1993) (internal citations omitted).]

Similarly, an equitable lien exists "only in those cases where the party entitled thereto has been prevented by fraud, accident, or mistake from securing that to which he was equitably entitled." *Cheff v Haan*, 269 Mich 593, 598; 257 NW 894 (1934).

The trial court concluded that defendant and Hansen acted fraudulently. Conspiracy to commit fraud requires proof of the following elements: (1) a material representation was made; (2) it was false; (3) when it was made it was known to be false or made recklessly without any knowledge of its truth or falsity; (4) it was made with intent that it would be acted upon by the plaintiff; and (5) the plaintiff acted in reliance upon it and thereby suffered injury. *Zaremba Equip, Inc v Harco Nat'l Ins Co*, 280 Mich App 16, 38–39; 761 NW2d 151 (2008). "It is generally recognized that fraud may be consummated by suppression of facts and of the truth, as well as by open false assertions . . . since a suppression of the truth may amount to a suggestion of falsehood. In order for the suppression of information to constitute silent fraud there must be a legal or equitable duty of disclosure." *Hord v Environmental Research Institute of Michigan*,

463 Mich 399, 412; 617 NW2d 543 (2000). quoting *United States Fidelity & Guaranty Co v Black,* 412 Mich 99, 125; 313 NW2d 77 (1981).

The trial court concluded that "[t]he evidence establishes Mr. Cassidy and Ms. Hansen engaged in concerted activity and conspired to attempt to defraud Ms. Cassidy out of her rightful share in the marital estate." This finding and conclusion is unassailable based on the record before us. In keeping with her right to assess the credibility of the witnesses before her, the trial court judge found credible plaintiff's testimony that defendant, on more than one occasion, denied that he was engaged in an extramarital affair with Hansen. Had plaintiff known about the affair, she would have divorced him. More importantly, defendant lied to plaintiff about where Hansen got the money to build the house on East Ellen. Defendant told plaintiff that Hansen had secured loans and had also received a substantial amount of money from her divorce. Neither of these assertions was true and plaintiff relied on them to her detriment. The evidence clearly demonstrated that defendant and Hansen acted in concert to deprive plaintiff of her rightful share of the marital assets. The trial court, exercising its equitable powers, correctly determined that a constructive trust existed.

Finally, Hansen argues that the trial court erred in placing a lien on the East Ellen home in an amount greater than the $364,000 Hansen "borrowed" from defendant. She claims that the judgment includes the $70,000 Hansen received from ConRadical, a company that defendant managed, and that the trial court had no authority to require Hansen to pay ConRadical back. Defendant's attorney objected when plaintiff's attorney began questioning Hansen about the use of ConRadical funds, but the trial court correctly determined that "if the money had instead gone to him as wages, then that would be marital money." It is obvious from the record that the trial court did nothing to adjudicate ConRadical's rights; instead, the trial court determined that the ConRadical funds Hansen received were defendant's "wages" and were in addition to the over $360,000 that defendant admitted to "loaning" defendant. The trial court included the $70,000 as part of the "loan" Hansen received from defendant.

## IV. DOCKET NO. 333319

On appeal, defendant does not challenge the trial court's finding that defendant was in contempt of court; instead, defendant claims that he was denied due process when the trial court ordered him to jail when he had no prior notice and when the trial court's written order for contempt contained harsher terms that what the trial court had verbally indicated at the hearing. The issue, therefore, is very narrow. We note that at all times defendant was represented by counsel and that the trial court found that he had the present ability to pay his obligations, a finding defendant does not appeal. See *Turner v Rogers*, 564 US 431; 131 S Ct 2507, 2511; 180 L Ed2d 452 (2011). "Whether a party has been afforded due process is a question of law, subject to review de novo." *In re Contempt of Henry*, 282 Mich App 656, 668; 765 NW2d 44 (2009).

Plaintiff filed a motion to show cause why defendant should not be held in contempt of court in July 2015 after defendant failed to comply with the trial court's June 3, 2015 judgment of divorce and the uniform spousal support order. Specifically, plaintiff alleged that plaintiff: (1) failed to comply with his obligation to pay plaintiff $1,000 a month in spousal support (retroactive to May 2015); (2) failed to make any payment on the $162,470.50 property settlement in which he was jointly liable with Hansen; and, (3) failed to pay plaintiff's attorney

fees.  After taking testimony from plaintiff, defendant, defendant's appellate counsel, and Hansen, the trial court determined that defendant was in contempt for failing to make full payment on his spousal support obligation.  The trial court further concluded that defendant failed to pay any amount towards plaintiff's attorney fees.  In particular, the trial court noted defendant's present ability to pay his obligations:  "Defendant appears to have more income or resources than he claims and is simply choosing to use those resources on personal expenditures rather than complying with the Court's orders."  The trial court noted that defendant had recently purchased a new vehicle, representing to the lending institution that his income was $50,000, yet recently testified in a related civil suit that, as of September 2015 he had only earned $10,000. The trial court detailed defendant's lavish spending in the face of his professed poverty. Defendant, through Hansen, had expended a significant amount on attorney fees for the divorce action, the civil action, and the IRS action.  The trial court was also unpersuaded that defendant had done what he could do to find gainful full-time employment.  Having found defendant in contempt of court, the trial court gave defendant until the next hearing date to demonstrate to the court how he would purge himself of the contempt.

As of the March 4, 2016 hearing, defendant had essentially purged himself of contempt regarding past spousal support obligations.  The trial court noted that "even if I assume that he's current on spousal support there's still a question about paying towards property settlement and paying towards the attorney fees."  The trial court was clearly focused on defendant's failure to pursue the promissory note against Hansen.  Defendant testified:  "I've spoken to Mary Hansen about it.  Her position is, she understands that she owes the money, she's not willing to begin working that down while it's – while the property is encumbered and if I – I guess, if I want to sue her to try and get some [of] it, I – I could start a lawsuit."  He continued to reside at the East Ellen address with Hansen.  The trial court ruled:

> I had hoped that there would be some type of effort towards resolving this matter and moving forward as a way beyond just the spousal support.  I mean, Ms. Hansen is paying $1,500 but that doesn't [alleviate] Mr. Cassidy's obligation to pay the other $1,500 of the $3,000.00 that I ordered he pay toward the property settlement.  So he hasn't paid anything on that and so he remains in contempt of court in that regard without any kind of real plan at this point.

> So he's got a job where he's making two -- $3,000.00 a month and the same – same problems that I had at . . . trial, is that he continues to drive a brand new car, that's what I'm assuming.  I mean, people who are flat broke don't go buy new cars without showing, in my mind, some level of disregard or flaunting their disrespect for court orders, that's how I see it.  In addition to the other things noted in my orders.

> So, he continues to not collect on or take any action with regard to the money that's due to him; he continues to live in the house as far as I know, essentially, for free.  He still remains in contempt of court and . . . I don't know what else to do.  I mean, I've given Mr. Cassidy time and time again and he seems like he does just only what he has to and nothing more.  As long as it – you know, as much as he has to sacrifice and . . .no more.

The trial court then ordered defendant to 10 days in jail. The following exchange took place:

> MR. WHITESMAN [defendant's attorney]: Just a – is the incarceration based on failure to pay the property settlement[?]
>
> THE COURT: It's failure to pay the attorney fees and it's the failure to – and it's a sanction. I can punish him for failing to follow court orders. I can't force – I can't –
>
> MR. WHITESMAN: For civil contempt.
>
> THE COURT: For failing to follow court orders. I can punish him for failing to follow court orders, which he has failed to do.
>
> MR. WHITESMAN: That – that would make it criminal not civil. Civil is strictly purging.
>
> THE COURT: If he pays before the time his sentence is done then, I guess – the amounts that are due then, I guess, he's purged his payment so I'll add that, that if he pays before the end of those ten days then he will no longer be required to appear at the jail.

Following a discussion regarding whether the trial court could properly order defendant to pay the property settlement via contempt proceedings[3], plaintiff and the trial court agreed that the contempt – and defendant's ability to purge the contempt – was premised on his failure to pay attorney fees. The contempt order specifically provides: "Defendant may purge his contempt by paying $150,619.88 in previously awarded attorney fees."

> MCL 600.1701(f) provides, in pertinent part:
>
> The supreme court, circuit court, and all other courts of record, have power to punish by fine or imprisonment, or both, persons guilty of any neglect or violation of duty or misconduct in all of the following cases:
>
> ***
>
> (f) Parties to actions, attorneys, counselors, and all other persons for disobeying or refusing to comply with any order of the court for the payment of temporary or permanent alimony or support money or costs made in any action for divorce or separate maintenance.

MCL 600.1715 further provides:

---

[3] "Michigan law is clear that property-settlement provisions of a divorce judgment may not be enforced by contempt proceedings." *Guynn v Guynn*, 194 Mich App 1, 2; 486 NW2d 81 (1992).

(1) Except as otherwise provided by law, punishment for contempt may be a fine of not more than $7,500.00, or imprisonment which, except in those cases where the commitment is for the omission to perform an act or duty which is still within the power of the person to perform shall not exceed 93 days, or both, in the discretion of the court. . . .

(2) If the contempt consists of the omission to perform some act or duty that is still within the power of the person to perform, the imprisonment shall be terminated when the person performs the act or duty or no longer has the power to perform the act or duty, which shall be specified in the order of commitment, and pays the fine, costs, and expenses of the proceedings, which shall be specified in the order of commitment.

"[T]he primary purpose of the contempt power is to preserve the effectiveness and sustain the power of the courts. Because the power to hold a party in contempt is so great, it carries with it the equally great responsibility to apply it judiciously and only when the contempt is clearly and unequivocally shown." *In re Contempt of Auto Club Ins Ass'n*, 243 Mich App 697, 708; 624 NW2d 443 (2000) (internal footnote and quotation marks omitted). "[T]there are three sanctions which may be available to a court to remedy or redress contemptuous behavior: (1) criminal punishment to vindicate the court's authority; (2) coercion, to force compliance with the order; and (3) compensatory relief to the complainant." *In re Contempt of Dougherty*, 429 Mich 81, 98; 413 NW2d 392 (1987).

Whether contempt is civil or criminal depends upon "the character and purpose of the punishment imposed." *In re Contempt of Rochlin*, 186 Mich App 639, 644; 465 NW2d 388 (1986). In this case, where defendant had the ability to pay, the contempt was civil as it was "intended to coerce the defendant to do the thing referred by the order for the benefit of the complainant." *Doughtery*, 429 Mich at 99. "Civil contempt proceedings seek compliance through the imposition of sanctions of indefinite duration, terminable upon the contemnor's compliance or inability to comply." *DeGeorge v Warheit*, 276 Mich App 587, 592; 741 NW2d 384 (2007). "Although civil sanctions may also have a punitive effect, the sanctions are primarily coercive to compel the contemnor to comply with the order." *Id*. Where a contempt action is civil, there is no need to find that defendant willfully disobeyed an order of the court; it is enough that defendant simply violated his duty to obey the court. *In re Contempt of United Stationers Supply Co*, 239 Mich App 496, 501; 608 NW2d 105 (2000).

Our Court has held:

No person may be deprived of life, liberty, or property without due process of law. US Const Am XIV, § 1; Const 1963, art 1, § 17; *Hinky Dinky Supermarket, Inc v Dep't of Community Health,* 261 Mich App. 604, 605–606, 683 NW2d 759 (2004). The essence of the right of due process is the principle of fundamental fairness. *In re Adams Estate,* 257 Mich App. 230, 233–234, 667 NW2d 904 (2003). The concept of due process is flexible, and analysis of what process is due in a particular proceeding depends on the nature of the proceeding, the risks involved, and the private and governmental interests that might be affected. [*In re Contempt of Henry*, 282 Mich App at 669.]

"[I]n a civil contempt proceeding, the accused must be accorded rudimentary due process, i.e., notice and an opportunity to present a defense, and the party seeking enforcement of the court's order bears the burden of proving by a preponderance of the evidence that the order was violated." *Porter v Porter*, 285 Mich App 450, 456–457; 776 NW2d 377 (2009).

There is absolutely no question that defendant was made well aware that incarceration was a possible sanction if he was found in contempt of court. At the August 10, 2015 hearing, the following exchange took place:

> THE COURT: All right, so we have some discussion as to – discussion as to whether this is civil contempt or criminal court – my law clerk thinks it's actually for settlement property may rise to the level of criminal contempt. I am going to proceeding [sic] on my belief and Mr. Wallach's [plaintiff's attorney] representation that we are dealing strictly with civil contempt at this point in time.
>
> That being said, Mr. Cassidy, I have sworn you in and you've stated your name for the record. Do you understand, sir, that you are here for civil contempt of court proceedings, in particular, it has been alleged that [] you have failed to pay spousal support as required by the Court; you have failed to pay a property settlement; that you have failed to pay attorney fees as ordered by this Court. Sir, do you understand those allegations?
>
> MR. CASSIDY: I understand the allegations.
>
> THE COURT: All right. Sir, if you are found guilty of civil contempt of court I may order any of the following sanctions: a fine of not more than $7,500.00; costs and expenses of the proceedings; damages to the injured party including attorney fees; incarceration until there's compliance with the court order or until compliance is no longer possible. Do you understand the possible sanctions, sir?
>
> MR. CASSIDY: I understand.
>
> ***
>
> THE COURT: And at this time, Mr. Cassidy, do you understand that you are entitled to a trial conducted in accordance with the Michigan Rules of Evidence?
>
> MR. CASSIDY: Yes.
>
> THE COURT: All right, and you understand the rights that go with a trial, is that correct?
>
> MR. CASSIDY: Yes.
>
> THE COURT: All right. So we will set the matter for trial.

Defendant acknowledged his awareness that incarceration was a possibility at other moments as well. At the September 21, 2015 hearing on plaintiff's motion to show cause, defense counsel asked for an adjournment and, during argument, noted "I mean, we're in a county where, God forbid if my client's sentenced to incarceration, you have a crowded jail generally." Counsel later noted that plaintiff's position "that the Court has the ability to hold somebody in contempt and put them in jail for nonpayment of property settlement is very radical . . ." On the first day of the contempt hearing, defendant testified "assuming I'm not in jail, I can have income opportunities." And later, "I know but I'm trying to keep myself out of jail so pardon me if I'm – if I'm trying to clarify something." On the second day of the contempt hearing, defendant testified that he was having health problems, which he attributed partly to "the stress of thinking about having to spend time in jail." Defense counsel also argued that defendant did not have the ability to pay attorney fees: "and if he doesn't have the ability to pay, he can't be held in civil contempt and if, God Forbid, he's jailed, okay, he can't be jailed for – if – if it's determined that his ability to pay is exhausted . . ." Defense counsel argued:

> So, it's our request that you deny the motion to hold him in contempt and also consider the following, he says that things are getting better; they don't sound like they're awesomely better but there does sound like there's some hope for improvement in his situation and aside from his health which is a very, very real concern and, you know, everything clearly will unravel if he is in jail and not able to work to the extent that he's, at least, got something going with [a former Harvard colleague].

Plaintiff's attorney responded:

> [W]hat I was trying to suggest and I think, frankly, neither I nor my client want to see Mr. Cassidy go to jail for an extended period of time to the point where you certainly have the power and authority to put him on a work release program so that he has to spend nights and weekends until whatever period of time you say is appropriate or he complies with whatever order you're going to issue as a result of these proceedings because maybe that will open up his eyes enough so that he starts to get the message, I don't know. Everything else that we've tried in this case [has] not done that yet . . .

The trial court's December 10, 2015 order likewise provides:

> The Court reserves a ruling on sanctions until the parties appear on February 23, 2016. At that time, Defendant may present proof of efforts he has made to comply with the Court's orders, including proof that he is up to date with the spousal support and cash payment awards. In addition, Defendant may present a plan to the Court of how he will purge himself of the contempt. In the event that Defendant is not up to date through February on spousal support and the monthly installments toward the cash payment, the Court's sanctions may include incarceration, with or without work release as the Court may determine, until Defendant pays the full amount due.

There is no merit to defendant's claim that he was deprived of due process. A rudimentary review of the record reveals that defendant feared incarceration and, as such, was clearly aware that incarceration was a possibility.

Defendant next claims that the written order of incarceration was harsher than the trial court's verbal order at the hearing. At the hearing regarding the judgment on sanctions, the trial court indicated:

> So what I am going to – like I said, I – I don't know what else to do so I am going to sentence Mr. Cassidy to ten days in jail to be served on the weekends and I will prepare – and he will be required to report to the jail at eight a.m. on Saturday mornings and he will likely be released early Sunday morning which the sheriff will likely count as two days not one. So he will be required to serve those. It's up to the sheriff, depending on the crowding and overcrowding at the jail . . .

The trial court's March 4, 2016 order provides that defendant was sentenced to the Genesee County Jail on weekends commencing at 10:00 a.m. Saturday until at least 5:00 p.m. on Sunday for a period of 10 days, from March 5, 2016 until April 3, 2016.

As an initial matter, "a court speaks through its written orders and judgments, not through its oral pronouncements." *In re Contempt of Henry*, 282 Mich App at 678. Thus, to the extent that the trial court's oral pronouncement varied from the actual order, the order controls. However, the trial court's statement at the hearing does not inherently conflict with the written order. The trial court's indication that defendant *might* receive some leniency depending on overcrowding was in no way a promise. Moreover, there is no record support for defendant's claim that the written order was "harsher" as punishment for defendant's claim at the hearing that he had been deprived of due process. In fact, defendant's arguments at the March 4, 2015 hearing echoed defendant's repeated previous claims that the trial court was attempting to impermissibly use a contempt proceeding to enforce a property disposition and that the proceeding was criminal, not civil, in nature. There is no record evidence to support defendant's theory that he was punished for pursuing a due process claim.

Having found that there is no need for remand there is no need to explore whether a new judge is necessary.

Affirmed. Having prevailed in full on all three appeals, plaintiff may tax costs. MCR 7.219.

/s/ Kirsten Frank Kelly
/s/ Elizabeth L. Gleicher
/s/ Douglas B. Shapiro